UNITED STATES v. UNITED STATES CARTRIDGE CO.

No. 14389.

United States Court of Appeals
Eighth Circuit.

Aug. 8, 1952.

George W. Meuth, Asst. to Chief of Frauds Section, Claims Division, Washington, D. C., and J. Gregory Bruce, Chief of Frauds Section, Claims Division, Washington, D. C. (Holmes Baldridge, Asst. Atty. Gen., Claims Division, George L. Robertson, U. S. Atty., William V. O'Donnell and Marvin C. Hopper, Asst. U. S. Attys., St. Louis, Mo., and Charles W. Tayler and Douglas J. Titus, Attys., Dept. of Justice, Washington, D. C., on the brief), for appellant.

Robert H. McRoberts, St. Louis, Mo. (Marion S. Francis, Thomas V. Connelly, and Bryan, Cave, McPheeters & McRoberts, St. Louis, Mo., on the brief), for appellee.

Before SANBORN, JOHNSEN and COLLET, Circuit Judges.

SANBORN, Circuit Judge.

The Government has appealed from a judgment dismissing an action brought by it under Sections 3490 to 3492, inclusive, of 31 U.S.C., 1940 Ed., § 231–233, the Revised Statutes of the United States, 31 U.S.C.A. §§ 231–233, to recover from the defendant (appellee) the forfeitures and double damages prescribed by Section 3490 for the commission of any of the acts prohibited by Section 5438 of the Revised Statutes, 18 U.S.C., 1940 Ed., § 80,[1] including the making or presenting of false, fictitious, or fraudulent claims and false certificates to obtain the payment of such claims.[2]

1. See Revised Criminal Code, 18 U.S.C.A. §§ 285, 1001.

2. Sec. 3490. "Any person not in the military or naval forces of the United States, or in the militia called into or actually employed in the service of the United States, who shall do or commit any of the acts prohibited by any of the provisions of section fifty-four hundred and thirty-eight, title 'CRIMES', shall forfeit and pay to the United States the sum of $2,000, and, in addition, double the amount of damages which the United States may have sustained by reason of the doing or committing such act, together with the costs of suit; and such forfeiture and damages shall be sued for in the same suit."

Sec. 5438. "Every person who makes or causes to be made, or presents or causes to be presented, for payment or approval, to or by any person or officer in the civil, military, or naval service of the United States, any claim upon or against the Government of the United States, or any department or officer thereof, knowing such claim to be false, fictitious, or fraudulent, or who, for the purpose of obtaining or aiding to obtain the payment or approval of such claim, makes, uses, or causes to be made or used, any false bill, receipt, voucher, roll, account, claim, certificate, affidavit, or deposition, knowing the same to contain any fraudulent or fictitious statement or entry, or who enters into any agreement, combination, or conspiracy to defraud the Government of the United States, or any department or officer thereof, by obtaining or aiding to obtain the payment or al-

The Government contends that, under the evidence and the applicable law, the District Court should have entered judgment for the Government against the defendant for $214,878,725.12.

The action was originally brought December 21, 1943. An amended complaint was filed February 9, 1945. The amended complaint was amended October 7, 1946. The case came on for trial June 12, 1950. The District Court's opinion, including its findings and conclusions, was filed January 16, 1951, 95 F.Supp. 384,[3] and judgment was entered on that day.

The defendant, a wholly-owned subsidiary of the Western Cartridge Company, of East Alton, Illinois, operated, under the general supervision of the Ordnance Department, the Government-owned St. Louis Ordnance Plant for the mass production of small arms ammunition (.30 and .50 caliber cartridges) for the armed forces under a cost-plus-a-fixed-fee contract with the Government. The contract was entered into in December, 1940. The St. Louis Ordnance Plant was not then in existence. The contract recited that the Government contemplated entering into a contract with the Western Cartridge Company for the construction of the plant under the supervision of that Company, and desired to have the defendant, "as an independent contractor on a cost-plus-a-fixed-fee basis, make all necessary preparations for the operation of said plant, including the training of operating personnel (other than the key personnel required to be trained by Western under the terms of its contract with the Government previously referred to), but excluding the procurement and supervision of the installation of manufacturing facilities; and operate said plant. * * *"

The manufacture of ammunition at the plant started on November 11, 1941, before the plant was completed. Apparently the plant was not completed until the spring of 1942. It consisted of 300 buildings having about 4 million square feet of floor space.

It had eight complete manufacturing units and a capacity of 12,000,000 rounds of ammunition every 24 hours. About 1200 persons were on its supervisory staff, and at times the plant employed as many as 36,-000 workers on three shifts. During its operation, which continued throughout the duration of hostilities in World War II, the plant manufactured about 7 billion rounds of ammunition.

This controversy between the Government and the defendant grew out of the defendant's alleged failure to maintain a proper system of inspection and to produce the quality of ammunition called for by the contract.

The contract contained the following provision under Title I ("Operation"), Article I-F-"Contractor's Inspection System":

"The Contractor shall maintain a satisfactory system of inspection, gaging and gage checking concurrent with manufacture, and no ordnance material shall be submitted for the Government inspector's approval which has not previously been inspected by agents of the Contractor and found to be up to the contract standard."

Reduced to its lowest terms, the claim upon which the complaint of the Government is based is that between February 1, 1942, and September 30, 1943, the claims presented by the defendant for its fixed fee, together with the certificates supporting such claims, were false, fictitious, or fraudulent because the defendant during that period resorted to certain schemes, tricks, and devices in connection with the manufacture, inspection, and packing of the ammunition produced, which caused defective ammunition to be intermingled with each lot of ammunition, rendering all of the lots unsuitable for use; that the acceptance of this ammunition by the Government was brought about by the fraudulent practices of the defendant, of which the Government was ignorant; and that the Government paid the false claims presented

lowance of any false or fraudulent claim, * * * " shall be imprisoned or fined.

These statutes are referred to as the "False Claims Statute".

3. The record on appeal shows that the opinion was filed January 16, 1951. The opinion as reported indicates the filing date as November 21, 1950.

by the defendant in reliance upon its false certificates and representations that the claims were correct and just.[4]

The defendant in its answer denied that it had made or presented false claims or certificates, or employed any of the schemes,

4. The amendment of the complaint, filed October 7, 1946, alleged:

"(5) The following schemes, tricks, and devices were employed by the defendant, its officers, agents, or employees at its said plant between February 1, 1942 and October 31, 1943, without the plaintiff's knowledge, in connection with the manufacture of .50 caliber and .30 caliber armor-piercing, tracer, or ball ammunition under the said contract:

"(a) On October 16, 1942 the defendant did submit some 700,000 rounds of .50 caliber ammunition for acceptance by the United States without having subjected the same to satisfactory visual inspection. This was accomplished by placing skids of ammunition within the U. S. Ordnance Department area as having been fully visually inspected and ready for acceptance, whereas such ammunition had been in fact only 'spot-checked' or not finally inspected at all.

"(b) On sundry occasions between May 1, 1942 and October 1943 the defendant submitted for acceptance by the United States .50 caliber ammunition as Grade A which had not passed the inspection requirements for Grade A. It had been agreed between the United States and defendant that certain types of ammunition would not be submitted for acceptance except as Grade B. The defendant nevertheless did cause the acceptance by the United States as Grade A of several hundred thousand rounds of ammunition which could properly have been accepted only as Grade B, by removing surreptitiously cards placed with boxes of Grade B ammunition and substituting therefor cards indicating that the ammunition was Grade A.

"(c) On sundry occasions between March and September 1942 the defendant did cause to be packed quantities of .30 caliber ammunition which had not been submitted to the United States for sampling and testing. This was accomplished by causing skids or boxes of ammunition to be removed from the inspection area to the packing area, and causing such ammunition to be packed as part of accepted lots.

"(d) Between March and September 1942 defendant did cause to be packed quantities of .50 caliber ammunition which had been rejected by the United States or by defendant's own inspectors or which had not been submitted for approval by the United States. This was accomplished by placing quantities of such ammunition with lots which were being made ready for packing at times when the representatives of the United States had finished taking their samples or were temporarily absent from the place where the ammunition was stacked, and packing the same as part of accepted lots. In connection therewith, the powder lot numbers on cards accompanying. rejected lots were altered to correspond falsely with powder lot numbers on the lots with which they were surreptitiously placed.

"(e) On sundry occasions between February 1, 1942, and October 1943 defendant did submit for acceptance by the United States .50 caliber ammunition which had been previously submitted and rejected, without causing the same to be reinspected as required, or after causing only random or spot checking to be performed, and did also submit ammunition which had been rejected by defendant's own inspectors, by surreptitiously placing quantities of such rejected ammunition on skids or cartridges which were being submitted to the United States for acceptance.

"(f) It had been understood and agreed by and between the United States and the defendant that starting in June 1943 no ammunition which had been previously rejected by the United States would be resubmitted except when accompanied by a certificate in writing by an agent of the defendant that the ammunition mentioned or described in such certificate had been subjected to machine gauging and weighing after rejection and before resubmission. The defendant nevertheless, during the period from June to September 1943, in connection with the submission of .50 caliber ammunition, did make, use, or cause to be made or used, certificates which were false and contained to defendant's knowledge fraudulent or fictitious statements or entries, in that such certificates stated or certified falsely that lots of ammunition had been regauged and reweighed as agreed upon between the United States and defendant under the terms of said contract, when in fact such lots had not been regauged or reweighed.

"(g) It was also a part of the aforesaid fraudulent schemes that the weighing and gauging machines be set in

tricks, or devices with which it was charged, or that the Government had sustained any damage by reason of the payment of the claims in suit. The defendant set up a number of defenses, some of which were, on motion of the Government, eliminated by the court. See United States v. United States Cartridge Co., D.C., 78 F. Supp. 81. The defendant alleged that, by the terms of the contract, all work, including the handling of funds, was to be performed at the expense and risk of the Government, and that it had agreed to indemnify and hold the defendant harmless against any loss, expense, damage or liability of any kind arising out of or in connection with the performance of the work, except to the extent that such loss, expense, damage or liability might be due to the personal failure on the part of the corporate officers of the defendant or of other representatives of the defendant having supervision and direction of the operation of the plant as a whole, to exercise good faith or that degree of care which they normally would exercise in the conduct of the defendant's business. The defendant further alleged that, by the terms of the contract, it was agreed that the defendant should not be liable for any failure in the performance of the contract except to this same extent, and that none of its corporate officers and none of its representatives having supervision and direction of the plant as a whole had any knowledge of the making of any false, fictitious, or fraudulent claims or certificates or of the doing of the acts or things charged against the defendant in the complaint as finally amended. The defendant alleged that nothing of which the Government complained was due to the personal failure of the corporate officers of the defendant or of any representative of the defendant having supervision and direction of the operation of the plant as a whole.

The issues were tried by the District Court without a jury. The Government introduced much testimony tending to show that during the period in suit there was a failure on the part of the defendant to maintain an adequate and satisfactory system of inspection during the process of manufacture of ammunition; that some ammunition was improperly graded; that rejected ammunition was resubmitted for acceptance without being reworked; that defective ammunition was intermingled with other ammunition; that ammunition which had not been submitted to nor accepted by the Government was surreptitiously intermingled and packed with accepted ammunition; and that, as a result of the tricks, schemes, and devices alleged by the Government, much of the ammunition produced during the period in suit was substandard and failed when used by the armed forces.

The defendant's evidence was to the general effect that no substantial irregularities in the maintenance of the established system of inspection had taken place; that the system of inspection set up was adequate and satisfactory; that any breakdowns in the system were due to the sporadic and isolated acts of employees acting contrary to their instructions; and that none of the schemes, tricks, or devices of which the Government complained were known to, approved, or ratified by the corporate officers of the defendant or any of its representatives having supervision and direction of the plant as a whole, or were the result of any failure of such officers or representatives to exercise good faith or that degree

such a way as to permit considerable variance from the desired dimensions or weights, and thus fail to throw out cartridges which varied to a greater extent than a maximum tolerance.

"(h) It was further a part of said fraudulent schemes and practices that production inspection requirements other than weight and gauge, final visual, and test firing were avoided in that on numerous occasions between February 1942 and October 1943 the defendant caused and permitted defective component parts of cartridges to flow into production and thereby become a part of the lots of ammunition which said defendant caused the United States to accept by reason of the fraudulent practices and subterfuges described in subparagraphs (a) to (g) of this paragraph (5)."

of care which they would normally have exercised in the conduct of the defendant's business.

The District Court in an exhaustive opinion dealt in detail with every aspect of this controversy. 95 F.Supp. 384. We shall endeavor to refrain from needless repetition. We do not understand that the District Court's recital of the evidentiary facts is seriously challenged, the Government's contention being mainly that the court's findings as to the ultimate facts were induced by an erroneous view of the law.

The ultimate basis for the dismissal of the case by the District Court is stated in the court's opinion as follows at page 428 of 95 F.Supp.:

> "It is our conclusion the plaintiff has failed to sustain its burden of proof. This record fails to present substantial evidence there was personal failure on the part of the corporate officers of defendant, or defendant's agent or agents having supervision and direction of the operations of the plant as a whole, to exercise good faith or that degree of care which they normally exercise in the conduct of defendant's business, so that such failure resulted in fraud in the presentation to the plaintiff of a false claim under the False Claims Statute."

In arriving at that conclusion the District Court refused to impute to the defendant knowledge of, or to hold it responsible for, the misconduct of certain subordinate employees upon which the Government largely relied to establish that the defendant was guilty of having made and presented the allegedly false claims in suit. This refusal of the court was based mainly upon the following provisions of the contract:

> "Title I
> Operation
> *   *   *   *   *   *
> "Article I-B—Statement of Work.
> *   *   *   *   *   *
> "9. It is the understanding of the parties hereto, and the intention of this contract, that all work, including the handling of funds, under this Title I is to be performed at the expense and

risk of the Government and that the Government shall indemnify and hold the Contractor harmless against any loss, expense, damage or liability of any kind whatsoever arising out of or in connection with the performance of the work under this Title I, except to the extent that such loss, expense, damage or liability is due to the personal failure on the part of the corporate officers of the Contractor or of other representatives of the Contractor having supervision and direction of the operation of the Plant as a whole, to exercise good faith or that degree of care which they normally exercise in the conduct of the Contractor's business.

> *   *   *   *   *   *
> "Title III
> General Provisions
> *   *   *   *   *   *
> "Article III-F—Special Provisions.
> *   *   *   *   *   *
> "5. * * * It is further understood and agreed that the Contractor shall not be liable for any failure or delay in the performance of this contract, or accountable for the loss or destruction of or damages to any materials, tools, machinery, equipment, supplies, Ammunition or other property located or stored at said Plant or used in connection with the operation thereof except to the extent that such failure, delay, loss, destruction or damage is due to the personal failure on the part of the corporate officers of the Contractor or of other representatives of the Contractor having supervision and direction of the operation of the Plant as a whole, to exercise good faith or that degree of care which they normally exercise in the conduct of the Contractor's business."

The Government contends that if these provisions limiting liability are construed to exempt the defendant from constructive knowledge of or from responsibility for the fraudulent acts of its subordinate employees, the provisions are void because in derogation of the False Claims Statute, contrary to public policy, and beyond the

authority of the officer who entered into the contract on behalf of the Government.[5]

The views of the District Court as to the validity and scope of the provisions of the contract limiting liability are stated as follows at pages 415–416 of 95 F.Supp.:

"These contract provisions were inserted at the instance and on the insistence of Mr. Olin, President of Western. Plaintiff approached him on the subject of construction and operation of the Plant. The Plant had not then reached blueprint stage, nor had its location been determined. The parties negotiated the contract, and in doing so dealt at arms length. Neither was compelled to contract or accept the contract on the terms set forth. There is no claim of failure on the part of either party to understand the terms of the contract. We assume each of the parties in negotiating the contract acted fairly and in good faith. In determining purpose and intent of the parties as to the interpretation that should be given to these liability limitation provisions, we take the language in its accepted meaning. The contract is not vague. Consider the surrounding circumstances. Defendant was undertaking a promotional obligation of immense size. Thousands of untrained workers would be necessary to carry on the operation. The plant must be built, equipped and placed in operation under the pressing necessity of effecting early and continuous production of ammunition in large quantities to meet a national emergency. Mr. Olin was a man experienced in the manufacture of ammunition. He must have envisaged there would be manifold problems presented in the requirement that untrained labor in large numbers be used. That he at least tried to limit defendant's liability for the conduct of this multitude of employees, who at that time were unknown, does not appear strange or unreasonable. Plaintiff is now asking for a judgment for $214,-878,725.12, based on defendant's liability for each and every act of each and every employee involved in the activities complained of, regardless of the origin or authority for the conduct of such employees. While defendant may not have foreseen this character of claim, or any specific character of claim for that matter, Mr. Olin doubtless saw a possibility of claims coextensive with the enormity of the proposed plant and its operation.

"Plaintiff argues the limitation of liability provisions were not intended by the parties to cover liability for fraud in submission of a false claim by an employee. We cannot read such an exception into the contract under its terms. There are no exceptions in the sections in Titles I and III. We cannot rewrite the contract. The contract does not enumerate specifically acts for which liability is limited in the two titles. It uses broad terms. We construe it to cover liability for any 'failures' in manufacture and delivery of ammunition under the contract. That is what it says in plain English. Recovery is now sought on the theory of 'failure' to comply with the contract. A 'failure' of such nature and extent as to constitute fraud in law and liability under the false claim statute. If there is no 'failure' in the manner stated, there can be no recovery.

"Plaintiff further contends the liability limitation provisions are against public policy. Plaintiff cites no authority so holding. We find none. The contract was made by a responsible officer of the plaintiff. He had authority to act. Would plaintiff imply this officer entered into a contract with defendant that would in execution, as to a provision repeated four times, do injury to the public good? The con-

---

5. The Contracting Officer was Brigadier General L. H. Campbell, Jr. The approval of the contract was recommended by C. M. Wesson, Major General, Chief of Ordnance, and the contract was approved "By direction of the Secretary of War," by Robert P. Patterson, The Assistant Secretary of War.

tracting officer's authority has not been questioned. Like the contracting officer, we see nothing in the contract of such an offensive nature as to place it in the class of agreements void because against public policy. Wherein does it do injury to the public good? Defendant was given no unbridled authority to proceed under the contract. The contract is replete with provisions for plaintiff to retain control over the operation of the plant and its personnel, even though they are designated as defendant's employees. Plaintiff could cancel the contract at will or could cause the discharge of any employee. The manner in which the work was done must meet plaintiff's approval. Defendant was not relieved of all liability by the contract. Liability was conditioned."

The contract in suit was made pursuant to the Act of July 2, 1940, 54 Stat. 712–714, 50 U.S.C.A.Appendix, §§ 1171, 1172. That Act authorized the Secretary of War to provide for the construction of munition plants and for the manufacture of munitions "at such places and under such conditions as he may deem necessary". It also authorized him, with or without advertising, to provide for the operation of any such plant "either by means of Government personnel or through the agency of selected qualified commercial manufacturers under contracts entered into with them". The only express limitation on the authority of the Secretary to contract was that the cost-plus-a-percentage-of-cost system of contracting should not be used.

█ The contract in suit, like other similar contracts, was the product of its time and environment. When it was executed, the Government was faced with the imminence of war, the necessity of providing for the mass production of ammunition in huge quantities in the shortest possible time, the problem of finding men with the ability and experience to construct and equip the necessary plants, to recruit the essential labor force in a highly competitive labor market, and to operate the plants after they were constructed and equipped.

Congress, we think, clearly intended to give the Secretary of War virtually a free hand in providing the means for meeting the emergency which then existed.

It is necessary to keep in mind that at the time of the execution of this contract there was no St. Louis Ordnance Plant, that the defendant had no labor force to operate it when constructed, and that in order to put such a plant in operation it would be necessary to recruit and train many thousands of completely unskilled persons in the art of manufacturing ammunition. It is apparent that, while the defendant was willing to undertake the recruiting and training of the necessary labor force and to manage the plant for the Government at its expense and under its supervision, the defendant was not willing to assume the risk of, or liability for, the misconduct of those employed at the plant, other than the personal misconduct of the defendant's own corporate officers and other representatives having supervision or direction of the plant as a whole.

While it has been definitely settled that the status of the defendant was that of an independent contractor and that the employees at the plant were its employees, Powell v. United States Cartridge Co., 339 U.S. 497, 506–508, 70 S.Ct. 755, 758, 94 L. Ed. 1017, it cannot be gainsaid that they were all working at a Government plant on Government machines, making Government ammunition out of Government raw materials, under Government supervision, and were paid out of Government funds. The Contracting Officer representing the Government had the right under the contract to "require the Contractor to dismiss from the work any employee the Contracting Officer deems incompetent or whose retention is deemed to be not in the public interest * * *." The Government also had the right to terminate the contract at any time upon reasonable notice.

The Government contends that, notwithstanding the provisions of the contract relieving the defendant of liability for the misconduct of subordinate employees at the plant, they were as a matter of law employees of the defendant, for whose acts

it was legally responsible and of whose misdoings it was necessarily charged with knowledge.

■ The general rule is that a corporation is liable for the torts and wrongful acts of its employees acting within the scope of their authority or the course of their employment. 13 Am.Jur., Corporations, § 1118, page 1043; 19 C.J.S., Corporations, § 1260, p. 946; 13 Am.Jur., Corporations, § 1125, page 1050; 19 C.J.S., Corporations, § 1278, p. 955; State on Inf. of Taylor v. American Insurance Co., 355 Mo. 1053, 1113–1115, 200 S.W.2d 1, 40–43; Egan v. United States, 8 Cir., 137 F.2d 369, 379; United States v. Armour & Co., 3 Cir., 168 F.2d 342; United States v. George F. Fish, Inc., 2 Cir., 154 F.2d 798, 801.

■ It is also the general rule that a corporation is charged with knowledge of all material facts of which an officer or agent acquires knowledge while acting in the course of his employment and within the scope of his authority. 13 Am.Jur., Corporations, § 1110, page 1035; 19 C.J.S., Corporations, § 1078, pp. 613–614; Maryland Casualty Co. v. Tulsa Industrial Loan & Investment Co., 10 Cir., 83 F.2d 14, 16, 105 A.L.R. 529.

The Government therefore argues that the defendant was bound by the knowledge of those of its employees who, during the course of their employment, committed or participated in committing fraudulent practices, and hence must be held to have known that it was making claims for a fixed fee to which it was not entitled and which was in fact unearned.

■ The Government also asserts, in effect, that since the False Claims Statute is for the protection and benefit of the public and "to provide for restitution to the government of money taken from it by fraud", United States ex rel. Marcus v. Hess, 317 U.S. 537, 551, 63 S.Ct. 379, 388, 87 L.Ed. 443, and since the provisions of the contract limiting the defendant's liability for the misconduct of employees below a certain level are contrary to the public policy expressed by the statute and contrary to good morals, the provisions of the contract limiting the defendant's liability were void or ineffective. It is well settled, of course, that the law will not sustain a covenant of immunity which protects against fraud, contravenes public policy, is prejudicial to the public welfare, is contrary to good morals, or relieves one of a duty imposed by law for the public benefit. 12 Am.Jur., Contracts, § 182, page 683; 38 Am.Jur., Negligence, § 8, page 649; Ganley Brothers, Inc., v. Butler Brothers Building Company, 170 Minn. 373, 212 N.W. 602, 603, 56 A.L.R. 1; Scott v. Beams, 10 Cir., 122 F.2d 777, 784, certiorari denied 315 U.S. 809, 62 S.Ct. 794, 86 L.Ed. 1208.

■ There is substance in the Government's argument. While the defendant was in reality, we think, an instrumentality of the Government, chosen by it to operate at its risk and expense the munitions plant in suit, the contract provided that the defendant's status should be that of an independent contractor and not that of an agent of the Government, and also provided that the employees at the plant were not Government employees but employees of the defendant. If this contract were to be regarded as one creating the conventional relationship between the Government and a commercial corporate contractor not subject to Government supervision and control, for the supplying of goods or services, and if the provisions limiting liability were to be viewed merely as an attempt to relieve such a contractor from liability for its own fraud, the Government's argument might perhaps be unanswerable.

But this was not a conventional Government contract made under normal conditions; it was an unusual arrangement made to meet a crisis. As Judge Johnsen said of this same contract in his concurring opinion in United States Cartridge Co. v. Powell, 8 Cir., 174 F.2d 718, 726: "The scheme, which is involved in the present situation, of producing munitions in government-owned plants, 'through the agency of selected qualified commercial manufacturers,' on the basis of cost plus a fixed fee for carrying on the operations, with title to both the materials used in the products manufactured resting at all times in the United States, was admittedly a novel and revolutionary set-up in the field of Ameri-

can industrial life. The 'Statement of Labor Policy,' issued jointly by the War and Navy Departments on June 22, 1942, with the approval of the President of the American Federation of Labor and the Chairman of the Congress of Industrial Organizations, characterized it in this language: 'The industrial units thus created are unique. * * * These plants embody a new and tripartite relationship among Government, labor, and management.' " [6]

The Secretary of War, under the statutory authority conferred upon him, unquestionably by the contract in suit undertook to allocate the risks and obligations which were to be assumed by the defendant and those which were to be borne by the Government. He could have operated the plant himself with Government personnel. He could, no doubt, have employed the defendant to operate it with Government employees. He chose to do neither, but agreed to relieve the defendant from the hazards which would arise from the wrongdoing of employees at the plant other than the defendant's own corporate officers and those of its representatives having supervision and direction of the plant as a whole. We think the Secretary was not compelled to require the defendant to assume entire responsibility for the undisclosed wrongdoings of the myriad of employees it was obligated to hire, under adverse conditions, in order to operate the plant, but was authorized to limit the defendant's risks in that regard to whatever extent he deemed necessary in order to secure its managerial services to produce, under Government supervision, ammunition for the armed forces.

If the District Court and this Court are wrong with respect to the validity or effect of the provisions of the contract upon which the dismissal of this action was based, the Government will, as it contends, be entitled to a new trial, since the District Court held that, if the knowledge of certain employees at the plant of misconduct resulting in unaccepted ammunition being packed for shipment with accepted ammuni-

tion was by imputation the knowledge of the defendant, then certain of the claims and certificates in suit were false and fraudulent. See pages 414 and 415 of 95 F.Supp. We refrain, however, from any consideration or discussion of questions which can be of consequence only in case of a new trial.

The judgment appealed from is affirmed.

---

6. This statement was not impaired by the reversal of our decision in that case by Powell v. United States Cartridge Co.,

339 U.S. 497, 70 S.Ct. 755, 94 L.Ed. 1017.