SCHALL, Circuit Judge.
 

 This is an action under the Contract Disputes Act of 1978, 41 U.S.C.A. §§ 601-13 (1994) (“CDA”). Charles W. Daff, Trustee in Bankruptcy for Triad Microsystems, Inc. (“Triad”), appeals the August 15, 1994 decision of the United States Court of Federal Claims in
 
 Daff v. United States,
 
 31 Fed.Cl. 682 (1994).
 
 [1]
 
 In that decision, following a trial, the court sustained the termination for default of Triad’s contract through the Small Business Administration (“SBA”) with the United States Army Missile Command (“MI-COM”).
 
 [2]
 
 In addition, the court granted the government recovery on its counterclaim for
 
 *1569
 
 the return of unliquidated progress payments and awarded it penalties and damages under the False Claims Act, 31 U.S.C. §§ 3729-31 (1994). We affirm.
 

 BACKGROUND
 

 I.
 

 In September 1984, MICOM awarded Triad Contract No. SB9-84r-l-1636 for the production of 1,432 TOW Missile Vehicle Power Conditioners (“TVPCs”).
 
 Daff
 
 31 Fed.Cl. at 686. TOW missiles are guided missiles that maintain contact, by means of a wire, with the source from which they are fired.
 
 Id.
 
 The missile operator focuses on the target, thereby guiding the missile.
 
 Id.
 
 A TVPC is a device that allows the missile to interface with a vehicle, such as a jeep.
 
 Id.
 
 Because it is exposed to the elements, the TVPC must be weatherproof.
 
 Id.
 

 Several contract provisions are pertinent to the instant dispute. The first of these provisions concerned the type of flux to be used when assembling the TVPCs. Flux, which is used to clean corrosion and residue from metal parts before they are soldered together, increases the ability of solder to adhere to metal. The metal to be soldered is dipped first in the flux and then in the molten solder. The solder, which is usually a tin-lead alloy, binds together the pieces of metal to be joined. The contract distinguished between RA (rosin activated) flux and RMA (rosin mildly activated) flux. RA flux contains solvents such as chlorine and bromine. If these solvents are not removed from a surface to be cleaned, they can form corrosive substances that degrade the metal underneath the soldered surface. RMA flux, in contrast, contains milder acid residues, which do not corrode the underlying metal. Section 3.2.2 of the contract stated as follows: “Rosin based fluxes conforming to QQ-S-571 and MIL-F-14256 shall be utilized. Type RA flux may be used only on printed board assemblies without stranded wires.”
 
 [3]
 

 The contract also contained a provision relating to the physical integrity of the TVPC chassis. An O-ring seals the chassis of the TVPC. Note 22 on Drawing 1206 of the contract required that the fit between the O-ring and the chassis be tight enough to allow the TVPC to emit no more than one bubble per minute when pressurized and submerged in three to ten inches of water.
 
 Daff,
 
 31 Fed. Cl. at 691.
 

 Finally, the contract incorporated by reference a number of standard government contract provisions, including the default clause set forth at Federal Acquisition Regulations (“FAR”) § 52.249-8, 48 C.F.R. § 52.249-8 (1984).
 

 The TVPC contract became effective September 21, 1984. By letter dated May 9, 1988, the contracting officer informed Triad that he was terminating the contract for default on the grounds that Triad had delivered defective goods and had falsified contract records. The letter concluded by stating that it was the final decision of the contracting officer. The letter was not preceded by a cure notice. At the time of the default letter, Triad had received $11,166,-479.00 in progress payments, and had furnished MICOM with 673 allegedly operational TVPCs.
 
 Daff
 
 31 Fed.Cl. at 687. After the default termination, MICOM tested the TVPCs it had received from Triad and made repairs where necessary, incurring $240,-714.74 in expenses in the process.
 
 Id.
 

 II.
 

 On May 11,1988, Triad filed for protection under the federal bankruptcy laws in California, its state of incorporation. Subsequently, on May 20,1988, it instituted an action in the United States District Court for the Northern District of Alabama, seeking,
 
 inter alia,
 
 reinstatement of the TVPC contract. The suit was dismissed for lack of jurisdiction on July 5, 1988, after the district court concluded that the action was governed by the CDA.
 

 In June and September of 1988, the government filed proofs of claim against Triad in the bankruptcy proceeding. In so doing, it asserted entitlement to $6,251,924.78 in un-liquidated progress payments.
 
 Id.
 
 The contracting officer demanded the return of the progress payments in a letter to Triad dated
 
 *1570
 
 July 28, 1988. This letter was not in the form of a final decision, however. Subsequently, on January 3, 1990, the contracting officer sent Triad a letter that was in the form of a final decision, in which he sought the return of the progress payments. On September 7, 1990, the bankruptcy court held that it lacked subject matter jurisdiction over the government’s claims and transferred the case to the Court of Federal Claims.
 
 [4]
 

 On November 20, 1990, Triad formally brought suit in the Court of Federal Claims. In its suit, it challenged the contracting officer’s final decisions of May 9, 1988, and January 3, 1990, which, respectively, terminated the TVPC contract for default and demanded the return of unliquidated progress payments. Triad asserted that the court had jurisdiction under both the Tucker Act, 28 U.S.C. § 1491(a)(1) (1994), and the CDA.
 

 On November 12, 1991, Triad submitted a claim to the contracting officer seeking to have the May 9, 1988 default termination converted to a termination for the convenience of the government and requesting the payment of convenience termination costs in the amount of $5,977,438.00. On March 12, 1992, after the contracting officer had failed to issue a final decision on the claim, Triad filed a Fourth Amended Complaint in the Court of Federal Claims, in which it joined the termination for convenience claim with its pending challenges to the default termination and the government’s demand for the return of unliquidated progress payments. In its answer to the Fourth Amended Complaint, the government alleged as an affirmative defense that Triad’s claims were barred by “fraud and illegality” relating to the con-eealment and falsification of TVPC test results. The government also counterclaimed against Triad for the unliquidated progress payments under the TVPC contract. Subsequently, on November 10, 1992, the government amended its answer to the Fourth Amended Complaint. In so doing, it repeated its counterclaim for the return of the unliquidated progress payments. In addition, it asserted a counterclaim under the False Claims Act.
 
 [5]
 
 The government based this second counterclaim on the allegation that Triad had defrauded the government (i) by using RA flux when the contract required RMA flux; (ii) by using Vaseline to conceal leak test failures, again contrary to the provisions of the contract; and (iii) by concealing its actions from MICOM. The government sought both penalties and damages under the False Claims Act.
 
 [6]
 

 Both before and after trial, Triad argued t that the Court of Federal Claims lacked jurisdiction because of various alleged deficiencies in the May 9, 1988 decision of the contracting officer terminating the contract for default. These arguments were rejected.
 
 Doff,
 
 31 Fed.Cl. at 687-88. On the merits, following trial, the court upheld the termination for default and awarded the government judgment on its counterclaims.
 
 Id.
 
 at 686. The court found that Triad had breached the TVPC contract and had committed fraud by using RA flux on stranded wires,
 
 id.
 
 at 691, by applying Vaseline to O-rings to seal units failing leak tests, and by concealing its actions,
 
 id.
 
 at 694. The court directed Triad to repay unliquidated progress payments in the amount of $5,602,177.36 and imposed on Triad a $5,000.00 civil penalty and $600,000.00 in treble damages under the
 
 *1571
 
 False Claims Act.
 
 [7]
 

 Id.
 
 at 697. This appeal followed.
 

 DISCUSSION
 

 We review the trial court’s findings of fact under the clearly erroneous standard.
 
 Transamerica Ins. Corp. v. United States,
 
 973 F.2d 1572, 1576 (Fed.Cir.1992). “A finding is ‘clearly erroneous’ when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.”
 
 United States v. United States Gypsum Co.,
 
 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). We review issues of law
 
 de novo. Triax-Pacific v. Stone,
 
 958 F.2d 351, 353 (Fed.Cir. 1992). Jurisdiction is an issue of law.
 
 Transamerica,
 
 973 F.2d at 1576.
 

 I.
 

 Triad argues that the Court of Federal Claims lacked jurisdiction over both its claims and the government’s counterclaims. It bases its argument on the contention that the contracting officer’s letter of May 9,1988 terminating the TVPC contract for default was defective as a jurisdictional prerequisite for a CDA action. A valid contracting officer’s decision is a prerequisite for a suit under the CDA.
 
 Sharman Co. v. United States,
 
 2 F.3d 1564, 1568 (Fed.Cir.1993). Starting from this premise, Triad claims that the contracting officer’s May 9 final decision was not valid because the contracting officer “lacked the authority to issue a CDA type termination decision on the basis of allegations of fraud on Triad’s part.” In making this argument, Triad points to 41 U.S.C. § 605(a), which states, in relevant part, that
 

 [a]ll claims by the government against a contractor relating to a contract shall be the subject of a decision by the contracting officer____ This section shall not authorize any agency head to settle, compromise, pay, or otherwise adjust any claim involving fraud.
 

 Triad also points to FAR § 33.010, which states, in relevant part, that a contracting officer’s authority “to decide or settle all claims arising under or relating to a contract subject to the [CDA]” does not extend to “[a] claim involving fraud.” 48 C.F.R. § 33.010 (1984).
 

 Finally, Triad cites
 
 Somali Development Bank v. United States,
 
 508 F.2d 817, 205 Ct.Cl. 741 (1974), and
 
 Mulholland v. United States,
 
 361 F.2d 237, 245, 175 Ct.Cl. 832 (1966), for the proposition that, in a CDA case, “[i]f there is no jurisdiction over the primary claim, then any government counterclaim must be dismissed as beyond the court’s jurisdiction.” From that starting point, Triad argues that the Court of Federal Claims did not have jurisdiction to hear the government’s counterclaims because the claims against which the government was asserting its counterclaims — Triad’s challenge to the default termination and its related claim for convenience termination costs— were not properly before the court in the first place by reason of the contracting officer’s lack of authority to issue the May 9, 1988 final decision terminating the contract for default.
 

 As is evident from the foregoing, the linchpin of Triad’s jurisdictional argument is the proposition that the contracting officer terminated the TVPC contract on account of fraud. The contracting officer’s May 9, 1988 final decision letter to Triad stated, in pertinent part, as follows:
 

 You are hereby notified that your [contract ... is hereby terminated pursuant to the contract clause entitled “Default”. Such termination will be effective immediately upon receipt of this notice of termination.
 

 This contract is terminated because of acts or omissions constituting the default as follows: Solderers performing work on this contract did not receive the minimum required level of training which resulted in defective and non-operational hardware delivered to the Government, and required records for certification of solderers have
 
 *1572
 
 been intentionally falsified resulting in damage to the Government. Your right to proceed further with performance of the contract is terminated.
 

 In his letter, the contracting officer stated two separate and distinct reasons for the default termination. The first reason was the delivery by Triad of “defective and nonoperational hardware” as a result of solderers who worked on the contract not having received “the minimum required level of training.” The second reason was the alleged intentional falsification of required records relating to the certification of solderers. Thus, we read the contracting officer’s letter as terminating the TVPC contract for default (1) because Triad had failed to perform in accordance with the requirements of the contract and (ü) because Triad had committed fraud.
 
 [8]
 

 As noted above, the TVPC contract incorporated by reference one of the standard FAR default clauses. That clause, set forth in FAR § 52.249-8, provides in pertinent part that
 

 [t]he Government may, ... by written notice of default to the Contractor, terminate this contract in whole or in part if the Contractor fails to—
 

 (i) Deliver the supplies or to perform the services within the time specified in this contract or any extension;
 

 (ii) Make progress, so as to endanger performance of this contract ...; or
 

 (iii) Perform any of the other provisions of this contract.
 

 48 C.F.R. § 52.249-8. “[I]n order for the contractor to render ‘timely performance,’ two basic requirements must be satisfied: (1) the product ... must conform to the required design/performanee specifications, and (2) the product must be delivered or the work completed by the specified due date.” John Cibinic, Jr. and Ralph C. Nash, Jr.,
 
 Administration of Government Contracts
 
 908 3d ed. 1995);
 
 see also Mega Const. Co. v. United States,
 
 29 Fed.Cl. 396 (1993). Thus, a contracting officer is entitled to terminate a supply contract for default when, as was alleged here, the contractor furnishes the government with goods that do not meet the requirements of the contract.
 
 Radiation Technology, Inc. v. United States,
 
 366 F.2d 1003, 1006, 177 Ct.Cl. 227 (1966). In short, FAR § 52.249-8 plainly granted the contracting officer authority to terminate the TVPC contract for default on account of defective contract performance. The contracting officer exercised that authority, and we see no reason to hold that his authority was in any way diminished by the fact that he asserted fraudulent conduct on the part of Triad as an additional ground for the default termination. Thus, the contracting officer’s May 9, 1988 letter constituted a valid final decision for purposes of establishing jurisdiction under the CDA, because the letter set forth a ground for the termination that the contracting officer was authorized to assert,
 
 i.e.,
 
 failure to perform according to the terms of the contract.
 
 [9]
 

 Triad contends, however, that to the extent the default termination was premised upon the delivery of non-conforming goods, it was “technically defective” because “[t]here was
 
 no
 
 cure notice as required under ... FAR 52.249-8.” We understand Triad to be arguing that the lack of a cure notice rendered the contracting officer’s May 9, 1988 final decision invalid and therefore ineffective as a jurisdictional predicate for a CDA claim. Assuming
 
 arguendo
 
 that any deficiencies in the TVPCs furnished by Triad were minor and that Triad thus substantially complied with the requirements of the contract, so that it was entitled to a reasonable period of time
 
 *1573
 
 in which to cure the defects,
 
 see Radiation Technology,
 
 366 F.2d at 1006, the error of terminating the contract for default without issuing a cure notice would not have any effect on CDA jurisdiction. Quite simply, Triad is urging us to find a jurisdictional defect because the default termination on the merits was premature. The contention is without merit and we reject it. That a default termination may be improper as a matter of government contract law has no bearing on the jurisdiction of the tribunal hearing the case under the CDA.
 

 Because the Court of Federal Claims had jurisdiction to hear Triad’s challenge to the termination for default, it had jurisdiction to adjudicate the government’s counterclaims.
 
 [10]
 
 Pursuant to 28 U.S.C. § 2508, the Court of Federal Claims is authorized to enter judgment in favor of the United States against a plaintiff in the amount in which the plaintiff is found to be indebted to the United States as a result of any “set-off, counterclaim, claim for damages, or other demand [which] is set up on the part of the United States against any plaintiff making claim against the United States in said court____” Additionally, under 28 U.S.C. § 1503, the Court of Federal Claims has jurisdiction “to render judgment upon any setoff or demand by the United States against any plaintiff in such court.” Thus, the court had jurisdiction with respect to both the government’s demand for the return of unliquidated progress payments and its fraud claims.
 
 [11]
 

 For the foregoing reasons, we conclude that the Court of Federal Claims had jurisdiction over Triad’s challenge to the default termination and its claim for convenience termination costs. We also conclude that the court had jurisdiction over the government’s counterclaim for the return of unliquidated progress payments, as well as its counterclaim under the False Claims Act.
 

 II.
 

 As noted above, the trial court found that Triad defrauded the government by using RA flux when RMA flux was required, by applying Vaseline to O-rings to hide leak test failures, and by hiding its actions. Triad’s first challenge to these findings is a legal one. With respect to the flux issue, it points to the fact that section 3.4.3 of the contract stated: “More active fluxes than those specified in 3.2.2 may be used, provided that all ionic and non-ionic contaminants are removed within one hour from the time that the item was returned.” Triad argues that this provision allowed the use of RA flux on stranded wires. With respect to the issue of Vaseline being used as a sealant, Triad claims that it “chose to lubricate the O-Ring to assure its proper installation because the standard trade practice indicated this process was necessary for successful and proper lubrication and sealing of the O-Ring.” Triad asserts that a note on the O-Ring contract drawing indicated to “a knowledgeable engineer ... that standard industry practice should be used for the installation of the O-Ring.” Triad thus contends that its use of Vaseline did not violate the provisions of the contract.
 

 Contract interpretation is an issue of law that we review
 
 de novo. C. Sanchez & Son, Inc. v. United States,
 
 6 F.3d
 
 *1574
 
 1539, 1544 (Fed.Cir.1993). As far as soldering is concerned, the contract stated in section 3.2.2 that “RA flux may be used only on printed board assemblies without stranded wires.” In the face of this clear and unequivocal provision, the general language in section 3.4.3 of the contract quoted above does not help Triad. We view that general language as only allowing the contractor to use more active fluxes than the fluxes “specified in 3.2.2.” The fluxes “specified in 3.2.2” are “[r]osin based fluxes conforming to QQ-S-571 and MIL-F-14256.” Section 3.4.3, upon which Triad relies, makes no reference to the prohibition against the use of RA flux on stranded wires that is contained in section 3.2.2. Triad’s argument fails because it runs afoul of the rule that specific contract provisions prevail over general provisions.
 
 See Hol-Gar Mfg. Corp. v. United States,
 
 351 F.2d 972, 980, 169 Ct.Cl. 384 (1965) (referring to the “settled rule that where an agreement contains general and specific provisions which are in any respect inconsistent or conflicting, the provision directed to a particular matter controls over the provision which is general in its terms”).
 

 We also reject Triad’s argument relating to the O-ring issue. It is important to recognize that the trial court’s fraud finding on this issue was not based merely on the fact that Triad used Vaseline in installing 0-rings. The court characterized as “innocent” Triad’s use of Vaseline to lubricate or clean O-rings prior to installation.
 
 Dajf,
 
 31 Fed. Cl. at 694. What the court found to be “pernicious” and what formed the basis for the court’s finding of fraud was the application of Vaseline to TVPCs that failed leak tests before they were retested: “There was no pretense at this point that the vaseline was used to help the O-ring seat better, or to clean off talcum powder. The sole purpose of liberal applications of vaseline was to avoid the effects of a failed, and unrecorded, leak test.”
 
 Id.
 
 Assuming that the note on the 0-ring drawing did incorporate trade practice into the contract — a proposition that the note hardly supports — and assuming further that trade practice would allow the use of Vaseline for certain limited purposes, it goes without saying that trade practice would not allow the contractor to use Vaseline-in order to conceal the failure of tests that were required under the contract.
 

 Next, Triad attacks the trial court’s findings of fact on the ft’aud issue. In determining that Triad had committed fraud, the court relied upon the testimony of government employees and former Triad employees. The testimony of the former Triad employees pointed to Triad’s consistent use of RA flux on stranded wires and of Vaseline on O-rings as a sealant after TVPCs had failed the leak test required by the contract. Triad characterizes the testimony of these witnesses as “questionable” and argues that the witnesses did not provide any evidence that Triad actually violated any of the contract provisions. We do not find this argument persuasive. The trial court’s fraud finding rests on the testimony of witnesses the court found credible.
 
 [12]
 
 Such credibility determinations are “virtually unreviewable.”
 
 Hambsch v. Department of the Treasury,
 
 796 F.2d 430, 436 (Fed.Cir.1986). We see no clear error in the trial court’s finding that the government proved by clear and convincing evidence,
 
 see Hageny v. United States,
 
 570 F.2d 924, 933, 215 Ct.Cl. 412 (1978), that Triad committed fraud under the TVPC contract.
 

 Finally, Triad contends that the trial court erred in its monetary award because the government presented no evidence as to the exact quantum of repair costs for fraud damages, and because the court should have offset the value of contract inventory in the government’s possession against the award of unliquidated progress payments. As for the evidence presented regarding repair costs, Triad has failed to convince us that the court clearly erred in its finding that, with one minor exception, the government presented sufficient evidence regarding the expenses
 
 *1575
 
 incurred in testing and repairing defective TVPCs.
 
 [13]
 

 As far as the contract inventory issue is concerned, the trial court found that
 

 [a]t the time of issuance of the government claims and as late as the time of filing the complaint, the manufacturing materials in question were not in the government’s possession or control____ Events subsequent to the claim and the complaint cannot add to the jurisdiction defined by the claims appealed____ [U]nder the present circumstances, the court has before it only the government’s demand for unliquidated progress payments, offset by accepted product. Accordingly, there is no occasion for the court to deal with the question of title to the manufacturing materials.
 

 Daff,
 
 31 Fed.Cl. at 696-97. Thus, the court did not offset against its award of unliquidated progress payments to the government the value of any manufacturing materials purportedly in the government’s possession. This was not error. The default clause incorporated into the contract required that “[t]he Contractor and the Contracting Officer shall agree on the amount of payment for manufacturing materials delivered and accepted and for the protection and preservation of the property. Failure to agree will be a dispute under the Disputes Clause.” FAR § 52.249 — 8(f), 48 C.F.R. § 52.249-8. Before the value of any inventory in the government’s possession could be offset against the award to the government of unliquidated progress payments, Triad had to submit a claim to the contracting officer to that effect.
 
 See Joseph Morton Co. v. United States,
 
 757 F.2d 1273, 1280 (Fed.Cir.1985) (claims “not inextricably linked with liability for fraud[ ] must first be the ‘subject of a decision by a contracting officer’ ”) (citing 41 U.S.C. § 605(a)). Because Triad had not submitted such a claim, the trial court was correct in concluding that it had no jurisdiction to decide the issue of the value of the inventory materials in the government’s possession and then offset that value against the progress payments award.
 

 CONCLUSION
 

 Because the contracting officer terminated the TVPC contract based upon Triad’s alleged failure to provide goods complying with the requirements of the contract, the Court of Federal Claims had jurisdiction with respect to Triad’s challenge to the default termination, Triad’s claim for convenience termination costs, and the government’s counterclaims. As far as the merits are concerned, neither the finding of the trial court that Triad committed fraud nor the trial court’s monetary award in favor of the government is clearly erroneous or tainted by legal error. We therefore affirm the judgment of the Court of Federal Claims in all respects.
 

 COSTS
 

 Each party shall bear its own costs.
 

 AFFIRMED.
 

 [1]
 

 . For ease of reference, we refer to Triad as the plaintiff in the various proceedings below.
 

 [2]
 

 . Triad was a certified small business under the SBA's 8(a) program pursuant to section 8(a) of the Small Business Act, 15 U.S.C. § 637(a) (1994).
 

 [3]
 

 . A stranded wire is composed of several smaller strands of wire twisted together.
 

 [4]
 

 . Prior to October 29, 1992, the Court of Federal Claims was named the “United States Claims Court." Federal Courts Administration Act of 1992, Pub.L. No. 102-572, § 907(b)(1), 106 Stat. 3921, 4519
 
 (codified at 28
 
 U.S.C. § 1491(a)(2) (1994)). In the interest of consistency, throughout this opinion we refer to the court by its present name.
 

 [5]
 

 . The Court of Federal Claims had jurisdiction to hear the government’s counterclaims trader 28 U.S.C. §§ 1503 and 2508 (1994).
 

 [6]
 

 . The False Claims Act provides, in relevant part, that
 

 [a]ny person who ... knowingly presents, or causes to be presented, to an officer or employee of the United States Government ... a false or fraudulent claim for payment or approval ... is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person____
 

 31 U.S.C. § 3729(a).
 

 [7]
 

 . The treble damages were based upon the costs incurred by the government in testing and repairing TVPC units that Triad had delivered to MICOM.
 
 Daff
 
 v.
 
 United States,
 
 31 Fed.Cl. 682, 695 (1994).
 

 [8]
 

 . The trial judge took the position that “[djefault was premised on the alleged falsification of records that the contract required be maintained with respect to certification of solderers” and he observed that ”[n]o other ground was offered." 31 Fed.Cl. at 687. As just indicated, we read the contracting officer’s letter more broadly. Thus, although we arrive at the same result as the Court of Federal Claims on the jurisdictional issue, we get there by a different route.
 

 [9]
 

 . This is not a case in which a contracting officer terminated a contract by relying solely on allegations of fraud. We therefore do not need to address the question of whether a jurisdictional defect would have existed if the termination for default letter had asserted fraud, and nothing more, as the ground for the termination.
 

 [10]
 

 . Prior to October 29, 1992, the Court of Federal Claims had jurisdiction over a challenge to a default termination only when that challenge included a monetary claim.
 
 See Overall Roofing and Constr. Inc. v. United States,
 
 929 F.2d 687, 688 (Fed.Cir.1991). When Triad brought suit in the Court of Federal Claims on November 20, 1990, that court had jurisdiction because Triad challenged not only the May 9, 1988 default termination but also the January 3, 1990 demand for the return of unliquidated progress payments that flowed from the default termination. Additionally, in its Fourth Amended Complaint, Triad added a claim for the payment of convenience termination costs. In October of 1992, Congress amended the Tucker Act to give the Court of Federal Claims jurisdiction over pure default terminations in which no monetary claim was asserted. Federal Courts Administration Act of 1992,
 
 codified at
 
 28 U.S.C. § 1491(a)(2).
 

 [11]
 

 . From the record before us, it does not appear that the contracting officer issued a final decision asserting the claims set forth in the government's November 13, 1992 fraud counterclaim. A contracting officer’s final decision is not a jurisdictional prerequisite to the government's assertion of a counterclaim under the False Claims Act, however.
 
 Simko Constr., Inc.
 
 v.
 
 United States,
 
 852 F.2d 540, 547-48 (Fed.Cir.1988).
 

 [12]
 

 . By contrast, the trial court found that at least one of the witnesses who testified in favor of Triad was “nervous, hesitant, and guarded when examined by government counsel, and professed to be unable to put in words the answers to simple questions.” 31 Fed.Cl. at 691 n. 4.
 

 [13]
 

 . The government presented bookkeeping records and the testimony of a maintenance management specialist to establish the sum expended by the government in repairing the TVPCs. 31 Fed.Cl. at 695.