BMY—COMBAT SYSTEMS DIVISION
OF HARSCO CORPORATION,
Plaintiff,

v.

The UNITED STATES, Defendant.

No. 90–252 C.

United States Court of Federal Claims.

Aug. 13, 1998.

Ordered published July 7, 1999.

Wilsie H. Adams, Jr., McKenna & Cuneo, Washington, D.C., for plaintiff. Alexander J. Brittin and Kurt J. Hamrock, McKenna & Cuneo, Washington, D.C., of counsel.

Carolyn G. Mark, Washington, D.C., with whom were Assistant Attorney General Frank W. Hunger, Director Michael F. Hertz, and Assistant Director Stephen D. Altman, for defendant. Joseph Terz, Assistant U.S. Attorney, of counsel.

## ORDER

MOODY R. TIDWELL, III, Senior Judge.

At the request of the parties, the consideration of this case has been divided into three phases. The first phase on liability included a trial, after which the court issued its opinion on liability on May 23, 1997, *see BMY— Combat Sys. Div. of Harsco Corp. v. United States,* 38 Fed.Cl. 109 (1997) (the liability opinion). The court denied plaintiff's claim for an equitable adjustment, allowed defendant's counterclaim under the False Claims Act, 31 U.S.C. § 3729 (1994) (FCA), allowed defendant's breach of contract counterclaim, and denied defendant's Special Plea in Fraud counterclaim pursuant to 28 U.S.C. § 2514 (1994). The case is now before the court for the second phase on defendant's motion for summary judgment on the issue of defendant's damages for plaintiff's violations of the False Claims Act and breach of contract. The third phase of the litigation will address quantum as framed by the liability opinion and this order. For the reasons set forth below, defendant's motion for summary judgment is denied as a result of the existence of disputed material facts.

## FACTS

The facts set forth below supplement those included in the liability opinion, which are incorporated by reference here. At the commencement of this case, plaintiff, BMY— Combat Systems (BMY), was an unincorporated division of Harsco Corporation that designed, manufactured and sold combat weapons systems, including the product at issue here, self-propelled M109A2 howitzers. The United States, through the Army, entered into Contract DAAA09–82–G–5811 (contract 5811) with BMY on November 15, 1984, from which defendant ultimately ordered 305 howitzers at a total price of $107,043,177.58.

The M109A2 howitzers each have a trunnion mounting bracket (TMB). The TMB is a large steel casting weighing several thousand pounds that is bolted to the cab of the howitzer. It attaches the howitzer to a vehicle and is an important component because the cannon is mounted through and secured in place by the TMB. Specifications for the TMB were set forth in TMB drawings and a TMB supplemental quality assurance provision (SQAP) incorporated into contract 5811.

Contract 5811 required that TMBs undergo two types of inspection. The first was a

radiographic (RT) inspection to determine the internal soundness of the casting by detecting internal discontinuities. The RT inspection requirements were set forth on the TMB drawing, the TMB SQAP, and a radiographic position chart. According to the TMB SQAP, 100% of the TMBs were to be RT inspected. The second type of inspection required under contract 5811 was a magnetic particle (MT) inspection to detect any discontinuities on the TMB's surface, such as "cracks & hot tears," which were termed "unacceptable." Joint Ex. 27 (Enlargement of Notes from TMB Drawings). The TMB SQAP specified that 100% of the TMBs were to be MT inspected. The contract placed no requirement on the government to perform any inspection or testing of the TMBs.

After each howitzer was manufactured, BMY presented it to a Defense Contract Administration Service (DCAS) official for review. The DCAS official would conduct or observe the final general inspection, subsequent to which BMY would submit to the DCAS representative a "constructive delivery" DD250 government form which would be signed by the DCAS representative. Each DD250 contained language requiring plaintiff to identify "deficiencies or areas of nonconformances" in the howitzer upon submission of the form to defendant. Joint Ex 172 (constructive delivery DD250 forms). After signature and upon receipt of shipping instructions, the vehicles would be prepared for shipment. At that time, plaintiff prepared a second DD250 form to invoice the government for shipping costs. The signed DD250 forms were used to secure payment for the howitzers accepted by defendant.

On November 1, 1984, plaintiff awarded a Purchase Order to the Adirondack Steel Casting Company (ASC) for the manufacture of 123 TMBs for contract 5811, at a price of $2,207 per TMB, for a total price of $271,461. Plaintiff accompanied the Purchase Order with the TMB SQAPs, drawings and specifications and provided ASC with its Procurement Instructions and Requirements Manual. On January 1, 1985, plaintiff issued Change Order No. 1 to the Purchase Order, whereby plaintiff increased the quantity of TMBs from 123 to 193, thus increasing the total cost of the Purchase Order to $425,951.

Beginning in April 1986, plaintiff acquired knowledge that ASC was not meeting the 100% RT and MT inspection requirements, particularly with respect to the journal bearing areas of the TMBs. Plaintiff did not disclose ASC's failure to properly inspect the TMBs to the government. In fact, plaintiff continued to maintain records delivered with each ASC TMB, certifying that the ASC TMB complied with contract 5811's specifications, including 100% RT and MT inspection. Subsequent to its gaining knowledge of ASC's noncompliance, plaintiff also continued to submit DD250 forms to the government invoicing it for acceptance and shipment of the howitzers, certifying that the TMBs complied with the contract specifications.

On August 29, 1988, a DCAS representative observed plaintiff inspecting the dimensional characteristics of an ASC TMB which did not pass inspection, and therefore asked for and received from plaintiff's inspectors the records for the TMB dimensional inspections. On August 31, 1988, during a meeting between DCAS and plaintiff on the deficiencies that had come to light, plaintiff confirmed that not all SQAP characteristics were being inspected, that plaintiff could not verify some characteristics plaintiff had documented as acceptable, and that the BMY form 45.95, which would indicate that the inspections had been performed, were incomplete.

As a result of plaintiff's failure to perform all required inspections on the TMBs, plaintiff submitted a Request for Waiver (RFW) on September 13, 1988, for all 305 vehicles produced under contract 5811, asking defendant to accept the TMBs despite the lack of inspections. In October 1988, BMY reported to defendant that it had completed RT and MT inspections on two representative TMBs, which had failed the inspections. The RFW was disapproved by defendant on November 7, 1988, based on discrepancies and nonconformances not addressed in the request.

Subsequently, defendant directed plaintiff to make RT and MT inspection results available for every contract 5811 TMB, and if this could not be done, the TMBs would have to

be inspected. At a November 22, 1988 meeting, plaintiff responded to the government's directives by arguing that the ASC TMBs were sufficiently sound, and that the government should continue to accept the TMBs even if plaintiff "could not produce" RT and MT inspection results. Plaintiff based its contention on a Finite Element Analysis (FEA) it had prepared. Defendant states that an FEA is a complex computer model that assists engineers in determining the stresses in a component when subjected to known forces and loads. Defendant was unsatisfied with plaintiff's FEA because it assumed defect-free material.

On March 27, 1989, defendant directed plaintiff to remove and inspect TMBs in the howitzers that did not have 100% inspection data. Plaintiff at that time informed defendant that 191 of the 305 ASC TMBs had incomplete data, i.e., had not been inspected per the contract. Based on the nonconformances in the ASC TMBs, defendant issued a safety of use message on April 21, 1989 to its military units using M109A2 howitzers produced under contract 5811. The howitzers were deadlined until inspections could be conducted and the defective TMBs replaced.

The parties met on May 5, 1989, and signed a Memorandum of Agreement (MOA) adopting BMY's proposal for it to conduct field RT inspections with portable radiographic equipment. This method would allow BMY to perform the inspections quickly without having to remove the TMBs from the howitzers. The field inspections were necessary to lessen the effect upon defendant's military readiness. The MOA set forth the field RT inspection and acceptance criteria and the actions to be taken while conducting the RT inspections. Defendant alleges, and plaintiff disputes, that the Army agreed to less severe acceptance criteria than that called for in contract 5811. Because MT inspections could not be performed in the field, the United States did not direct MT inspections to be undertaken concurrently with the field RT effort.[1] Defendant did

require BMY to RT and MT inspect TMBs in twenty-five howitzers destined for Korea and remaining at BMY's plants, which BMY did during May and June 1989. Defendant alleges that 14 of those TMBs failed the RT inspection, and 24 of the 25 failed the MT inspection.

**Field RT Inspections and ASC TMB Replacements**

The bulk of the howitzers containing ASC TMBs were located at various Army bases in the United States. During manufacture, the TMB should have been RT inspected prior to being placed in the howitzers. For the substitute field x-ray procedure, the TMB was not removed from the howitzer. Instead the equipment around the TMB was removed so that the x-ray source could be placed inside the howitzer to radiograph the TMB. Plaintiff alleges, and defendant disputes, that because the field RT inspections encompassed different areas of the bracket not included in contract 5811. TMBs were rejected in the field for discontinuities that would not have shown up in the original RT inspection.

The field RT inspections took approximately two to three months to complete. As a result of the field x-ray of the TMBs, the United States discovered 76 of the 191 ASC TMBs that had not been inspected during manufacture were defective and directed their replacement.

Defendant alleges, and plaintiff disputes, that BMY had difficulty supplying a sufficient float of TMBs to replace the defective TMBs. Defendant further claims that BMY was initially very reluctant to begin manufacture of the float. Therefore, to ensure military readiness, the Army began manufacturing replacement TMBs at Rock Island Arsenal (RIA), which cast the pieces, and Watervliet Arsenal, which assembled the TMBs. Based on the early results of the field x-rays and BMY's capacity to machine rough castings at that time, defendant projected that it would need 105 TMBs. Defendant states that while RIA cast enough

---

1. Despite the court's finding in the liability opinion that MT inspections could not be performed in the field under the circumstances involved in this case, plaintiff continues to assert that the MT

inspections could have indeed been performed in the field. See Pl.'s Statement of Gen. Issues, filed Mar. 3, 1998, at ¶¶ 51, 53.

pieces to make 105 TMBs, the Army decided to have Watervliet assemble only 40 TMBs. Defendant further alleges, and plaintiff· disputes, that of the 40 TMBs, "about 10 have been used to replace ASC TMBs." Def.'s Prop. Findings of Uncon. Facts, filed Feb. 3, 1998, at ¶ 47.

Defendant further alleges that BMY did not have the capacity to repair the ASC TMBs at BMY in the howitzers destined for Korea. Therefore, defendant claims that BMY asked for the Army's assistance to repair the ASC TMBs in the Korean howitzers. The ASC TMBs were shipped to Watervliet Arsenal for repair.

**MT Inspections**

The MT inspections could not be conducted in the field. In May 1989, BMY prepared a fracture mechanics analysis, purporting to demonstrate to the Army that MT inspections were unnecessary. Defendant consulted outside experts and Army personnel to inquire into BMY's conclusions and to determine whether the howitzers containing TMBs without having been MT inspected could at least be released for safe use for a limited period of time. As part of its engineering analysis, defendant assembled a team of experts and employed an engineering consulting firm, Barnes & Reinecke, who performed a series of mathematical calculations and allegedly determined that a cracked TMB could only withstand a limited number of full charges before the cracks in the TMBs propagated to failure. Due to this conclusion, Army personnel decided that more tests were necessary to ensure the safety of the brackets, as howitzer crews would be killed if a bracket failed. Defendant alleges that the experts were concerned about the accuracy of the FEA computer models used to determine stress values. Instead of shipping all TMBs to a facility capable of performing MT tests, which was determined to be too costly and time-consuming, coupled with the possibility of adversely affecting military readiness, the Army decided to conduct tests on a limited number of TMBs to come to general conclusions about the TMBs' limits.

First, defendant alleges that to determine stress values and confirm the experts' computer models, strain gauge testing was conducted through live firing at Yuma Proving Ground. The experts also recommended material testing of actual ASC TMBs in order to confirm the material properties used in the calculations, which had been derived from handbooks on metallurgy Several ASC TMBs that had been rejected during the held RT testing were shipped to RIA's Metallurgical Laboratory where they were radiographed again with non-portable x-ray equipment, magnetic particle inspected and subjected to a variety of mechanical property tests including chemical composition tests, tensile strength tests, charpy impact tests, and fracture toughness tests Defendant alleges that the laboratory RT was performed to provide confidence and verify the field results using the portable RT equipment. Defendant further alleges that the RIA material tests indicated that the ASC TMBs exhibited poor material properties and lacked homogeneity, and that the values in the handbooks that the experts had used in performing their calculations were much better than the actual values in the material in the ASC TMBs.

As a result of the material tests, the experts recommended a series of live fire tests in two stages on ASC TMBs with severe defects. The first stage of testing was conducted at ambient temperatures at the Aberdeen Proving Ground. The second stage was conducted in a specially-designed "cold room" at the RIA. The live firing consisted of a total of 1150 firings, which defendant alleges resulted in a machined crack not having any detectable growth. The experts' calculations had established a benchmark of 4,000 cycles to failure of the crack. To cost effectively test more cycles, defendant conducted a simulation test that subjected a section of a TMB to 50,000 cycles. Defendant also obtained an additional metallurgical report demonstrating that the TMBs were of very poor quality.

Based upon the information available to it, the Army decided not to immediately replace all ASC TMBs. Instead, the ASC TMBs were to be MT inspected as the howitzers were returned for depot overhaul. The Army drafted a set of requirements that were to allow certain cracks and hot tears,

but if the indications exceeded the maximum size allowable, the ASC TMB would have to be replaced. The Army states that it will continue to incur costs to MT inspect the TMBs in the future.

## PROCEDURAL HISTORY

A trial was held on liability from July 8 to July 29, 1996. On May 23, 1997, this court issued its liability opinion denying plaintiff's claim for an equitable adjustment for its additional costs for work performed on the howitzers after acceptance. *See BMY*, 38 Fed.Cl. at 109. In accordance with 48 C.F.R. § 52.246–2(k) (1996) on Inspection of Supplies in fixed price contracts, the government's acceptance of the howitzers was deemed revoked and therefore not final as a result of the fraud committed by plaintiff.[2] *BMY*, 38 Fed.Cl. at 123. In addition, the court allowed defendant's counterclaim under the False Claims Act, 31 U.S.C. § 3729, for plaintiff's knowing submission of false claims and false records to support its false claims, and the resulting injury to defendant. *Id.* at 123–27. The court also allowed defendant's counterclaim that plaintiff breached its contract when it tendered howitzers that did not conform to the contract *Id.* Finally, the court denied defendant's Special Plea in Fraud counterclaim. *Id.*

Subsequent to the opinion on liability, the parties filed their briefs on damages. *See* Def.'s Br. on Damages, filed July 7, 1997; Pl.'s Resp. to Def.'s Br. on Damages, filed Aug. 13, 1997; Def.'s Reply Br. on Damages, filed Aug. 18, 1997. Pursuant to discussions held during a status conference on January 14, 1998 and an order filed the same day, the court instructed defendant to refile its damages brief in the form of a motion for summary judgment. This therefore became the second phase in accordance with the three-phase procedure requested by the parties during the early stages of the litigation. Defendant filed, on February 3, 1998, the pres-

ent motion for summary judgment.[3] Specifically, defendant claims as single damages under the False Claims Act its costs allegedly resulting from plaintiff's failure to RT inspect the TMBs, including its inspection, repair and replacement costs, interest on certain premature contract payments, the value of the replaced TMBs, and certain administrative costs. Defendant also seeks penalties under the False Claims Act. For plaintiff's breach of contract, defendant seeks the costs allegedly resulting from plaintiff's failure to MT test the TMBs, along with interest on its premature payments, and prejudgment interest.

## DISCUSSION

### I. Summary Judgment

Summary judgment is appropriate when there exist no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Campbell v. United States*, 2 Cl.Ct. 247, 249 (1983). A genuine issue of material fact is one that would change the outcome of the litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court does not weigh the evidence; it only determines questions of law based upon undisputed facts. Disputes over facts which are not outcome determinative, however, will not preclude the entry of judgment. *Id.* at 248, 106 S.Ct. 2505. When the moving party has met its burden of showing entitlement to judgment as a matter of law, the burden shifts to the non-moving party to provide facts establishing that a genuine issue for trial exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), and the non-moving party may not discharge its burden by cryptic, conclusory, or generalized responses. *See Willetts v. Ford Motor Co.*, 583 F.2d 852, 856 (6th Cir.1978); *Tunnell v. Wiley*, 514 F.2d 971, 976 (3d Cir.1975).

---

2. The court also found that plaintiff had committed gross mistakes amounting to fraud, which would also result in the revocation of defendant's acceptance of the howitzers. *See* 48 C.F.R. § 52.246–2(k).

3. In its opposition to defendant's motion, plaintiff incorporated by reference its earlier response brief on damages, filed August 13, 1997. Therefore, in considering defendant's present motion for summary judgment and plaintiff's opposition thereto, the court consulted the parties' earlier damages briefs.

In its motion for summary judgment, defendant provided both the categories and quantum of damages it seeks. Because of the existence of a myriad of disputes over material facts, however, the court must deny defendant's motion for summary judgment. The court has, however, delineated a legal framework for the availability of certain categories of damages. The parties are admonished to seriously consider this framework as the case proceeds to quantum.

## II. False Claims Act Damages and Penalties

In the liability opinion, this court found plaintiff BMY liable under the False Claims Act for submitting false claims and for submitting false records in support of its false claims. The False Claims Act holds liable:

> Any person who (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; [or] (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; ....

31 U.S.C. § 3729(a)(1)-(2). Liability to the Government under the Act consists of civil penalties of "not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person ...." 31 U.S.C. § 3729(a). In addition, "[a] person violating this subsection shall also be liable to the United States Government for the costs of a civil action brought to recover any such penalty or damages." *Id.* The United States must prove all elements of a False Claims Act cause of action, including damages, by a preponderance of the evidence. 31 U.S.C. § 3731(c).

In the liability opinion, the court found that the DD250 forms submitted by plaintiff to the government were invoices for payment containing an implied representation that the howitzers complied with the contract requirements. The court held that the submission of each DD250 violated subsection 3729(a)(1) of the FCA because plaintiff deliberately and knowingly stated that the TMBs had been RT and MT inspected. The fraud resulted in injury to defendant. The court also found that plaintiff had violated subsection 3729(a)(2) of the FCA by knowingly using ASC Certificates of Compliance and plaintiff's own form 45–9s as records to demand payment from defendant. The court found that plaintiff violated subsection 3729(a)(2) by stating that the records supported that the howitzers met all contract specifications, even though plaintiff knew that the TMBs had not been inspected.

As a result of the court's finding of liability under the False Claims Act, defendant is entitled to recover its trebled damages sustained from plaintiff's submission of the false claims, along with any applicable penalties.

### A. Single Damages

■ The FCA itself does not specify how to quantity damages, but instead states that the government should be awarded damages that it "sustains because of" the contractor's fraudulent acts. 31 U.S.C. § 3729(a). Damages under the FCA are intended to "provide for restitution to the government of money taken from it by fraud...." *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 551, 63 S.Ct. 379, 87 L.Ed. 443 (1943). Trebling the damages and imposing penalties "was chosen to make sure that the government would be made completely whole." *Id.* at 551–52, 63 S.Ct. 379.

■ Because each case under the FCA involves unique types of damage to the government, a formula for calculating damages must be created for each case that will provide the government with its damages directly caused by the filing of a false claim. "Ordinarily the measure of the government's damages would be the amount that it paid out by reason of the false [claims] over and above what it would have paid if the claims had been truthful." *United States v. Woodbury*, 359 F.2d 370, 379 (9th Cir.1966). Courts utilize several methods of damage calculations intended to ensure that the government receives "the benefit of its bargain," being careful not to award consequential damages. *See United States v. Aerodex,*

*Inc.*, 469 F.2d 1003, 1011 (5th Cir.1972) ("[T]he language of the False Claims Act does not include consequential damages resulting from delivery of defective goods.").

Plaintiff argues that the categories of damages that defendant now seeks are largely unrecoverable because the court already made "findings" in the liability opinion on the categories of False Claims Act damages. Plaintiff claims that the only measure of damages available under the FCA is the so-called "diminution in value" measurement, the difference in value between the product delivered and the product contracted for. *See United States v. Bornstein*, 423 U.S. 303, 316 n. 13, 96 S.Ct. 523, 46 L.Ed.2d 514 (1976). In *Bornstein*, the court found that FCA single damages in that case equaled "the difference between the market value of the [item] it received and retained and the market value that the [item] would have had if it had been of the specified quality." *Id.* Plaintiff states that because the court already found that defendant failed to prove that the ASC TMBs actually possessed defects that caused injury, defendant's damages under the diminution of value measurement should be very limited. Moreover, plaintiff states that the government's theory of damages is flawed because it does not reflect the court's finding of injury to the government from the delay caused by the deadlining of howitzers with ASC TMBs. In addition, plaintiff states that the only category of the government's claimed damages that arguably falls within the scope of the liability opinion, interest on contract payments made prematurely by the government, is unrecoverable under established FCA case law.

The court finds plaintiff's reading of the liability opinion to be absurdly narrow. Plaintiff is incorrect in its statement that "[t]he court's opinion makes it clear that the court used the word 'injury' in the same sense as damages." Pl.'s Opp. to Def.'s Mot. for Summ. J. at 12 (citing *BMY*, 38 Fed.Cl. at 127). The court's discussion of "injury" to the government in the breach of contract section of the opinion did not define or limit the types of the government's FCA or breach damages. The court's finding that the injury caused by plaintiff's FCA violation was the

effect of the delay for deadlining the howitzers was also not intended to limit the categories of the government's damages. To the contrary, such categories were always intended to be delineated in the second and third phases of the litigation.

■ Damages under the FCA are to be determined in a flexible manner to ensure proper recovery of direct, and not consequential, damages resulting from the making of a false claim. While the "diminution in value" measurement is appropriate on some facts, *Bornstein* did not mandate the use of this measurement in all FCA damages cases and courts have used alternative approaches when it is more appropriate on the facts of a particular case. *See, e.g., Daff v. United States*, 31 Fed.Cl. 682, 695 (1994) (awarding as FCA damages the government's inspection and repair costs when the contractor had fraudulently concealed the failure of the product to pass contractually required tests), *aff'd*, 78 F.3d 1566 (Fed.Cir.1996). The following discussion therefore articulates the categories of single FCA direct damages potentially recoverable on the facts of this case.

**1. Damages Incurred During Government Inspection, Repair and Replacement of TMBs**

The government asserts that it is entitled to inspection, repair and replacement costs that it allegedly incurred as a direct result of the fraudulent acts of BMY. Specifically, the government seeks damages for: (1) the inspection and repair by Watervliet of TMBs in howitzers located at BMY and destined for Korea; (2) the RT and MT inspections of ten TMBs performed at the Letterkenny Army Depot (LEAD), and the resulting repair of five of the TMBs that failed the RT inspection; (3) LEAD's coordination of changeouts during the field inspections; (4) travel costs incurred to send government quality assurance personnel to participate and review field x-rays; (5) costs to move the TMBs around; and (6) costs incurred at Watervliet and RIA to manufacture replacement TMBs.

■ Costs of inspection and repair incurred by the government as a result of a contractor's false representation that a product passed inspection pursuant to the con-

tract are recoverable as FCA single damages. *Daff*, 31 Fed.Cl. at 695. In *Daff*, the court awarded as part of the government's FCA single damages the government's costs to disassemble, test and repair TOW Missile Vehicle Power Conditioners (TVPC) after the contractor applied Vaseline to O-rings to hide leak test failures in the TVPC. *Id.* The leak tests were a requirement under the contract. *Id.* at 691. The trial court found that the costs associated with the disassembly and testing of the units were justified as FCA single damages because of the government's "concerns with the integrity of the units." *Id.* at 695.

In the case at bar, plaintiff attempts to distinguish *Daff* by stating that it, and not the government, incurred the costs of inspection and repair. The government, however, asserts that it did incur costs along with BMY in the field RT inspection and repair effort. Plaintiff further states that in *Daff*, unlike in the present case, the government had established entitlement to damages flowing from the defects in the product. This court, however, sees no difference between *Daff's* justification of damages for testing and repair because of the government's "concerns with the integrity of the units," and the costs allegedly incurred by the government in this case. The costs, if any, incurred by the government during the field RT effort were similarly caused by BMY's submission of claims falsely ensuring inspection of the TMBs, and the resulting fears of the government that the uninspected TMBs would fail when deployed if indeed they were defective. Contrary to plaintiff's arguments, *Daff* is very similar to the present case.

As a legal proposition, the government's costs incurred during the field RT inspection and repair effort, if any, would be reasonable as single damages under the FCA. Costs recoverable under this category may potentially include those incurred during inspections performed by the government in place of BMY, repair of TMBs that failed the RT inspections, government coordination of changeouts in the field, travel costs to send government quality assurance personnel to participate in and review the field x-rays, and related TMB transportation costs.

In addition to costs for inspection and repair, the government seeks its costs for manufacturing replacement TMBs at RIA and Watervliet Arsenal. Defendant alleges that the manufacture of replacement TMBs was necessary because it was unsure of whether BMY had the capability of quickly replacing defective TMBs found after the field RT inspections. Defendant claims that government personnel, having deadlined the howitzers containing the ASC TMBs for safety reasons, and based upon the early results of the field x-rays, decided that it needed to manufacture 105 replacement TMBs. Defendant states that only 40 of those were actually assembled, and that 10 have been used to replace ASC TMBs. Plaintiff disputes that any have been used to replace ASC TMBs. Plaintiff claims that these replacement costs were unrelated to the field inspections and were due to the speculation by the government that additional brackets would be needed in the future.

The government's costs to manufacture replacement TMBs are likely direct costs resulting from the submission of the false claims. The extent of such costs, however, will depend upon clarification of the factual issues involved during the quantum phase.

## 2. Interest Value of Premature Payments Resulting From Fraudulent DD250s

■ Defendant seeks as part of its FCA single damages the interest value on premature payments made pursuant to DD250s submitted for howitzers containing uninspected TMBs. Defendant seeks such interest for payment on DD250s submitted by BMY after BMY gained knowledge of ASC's failure to inspect as required. Defendant proposes to calculate the interest from the date of payment of the DD250 to the date the applicable TMB was replaced, if that was required, or the date of the RT field inspection if no replacement was necessary.

Plaintiff argues that recovery of such interest as single damages under the FCA is in clear violation of the Federal Circuit's decision in *Young–Montenay, Inc. v. United States*, 15 F.3d 1040 (Fed.Cir.1994). This court, however, agrees with defendant that

not only does *Young–Montenay* not preclude the award of interest as FCA damages, the court in *Young–Montenay* actually decided that the government was entitled to a greater amount, the value of the overstatement of the invoices, rather than simply the interest. *Id.* at 1043.

While *Young–Montenay* awarded the overstatement of the invoice as FCA damages, the court finds that in this case the interest on the premature contract payments is a more appropriate measure of damages. The principal, rate and precise term of such interest must be determined in the quantum stage.

### 3. Damages Equaling Value of TMBs Replaced

Defendant seeks the replacement value for the 76 TMBs that were rejected and replaced because they failed the field RT inspections. Defendant argues that at the time the TMBs were delivered, they had no value. Therefore, defendant claims that it is entitled to the full cost of each TMB. Plaintiff claims that allowing the replacement value of the TMBs would result in an over-recovery to the government, especially in light of the fact that BMY replaced a number of these TMBs. The court will likely allow the government to recover the replacement value of the TMBs that failed the RT inspections, however the value of any benefit that BMY bestowed upon the government when it replaced a number of those TMBs pursuant to the MOA will be subtracted from the government's damages after they are trebled. *See Bornstein,* 423 U.S. at 316, 96 S.Ct. 523.

### 4. Administrative Costs Processing Requests For Waivers

The government includes in its claim for FCA damages its administrative costs incurred processing RFWs associated with the TMB repair and replacement effort. Such RFW's were submitted by BMY, RIA and Watervliet Arsenal. The court is inclined to

disallow such costs, as they appear to be consequential to BMY's submission of false claims. *See Aerodex,* 469 F.2d at 1011.

### B. Penalties

The FCA provides for a civil penalty (in addition to damages) of "not less than $5,000 and not more than $10,000." 31 U.S.C. § 3729(a). The penalty provision of the FCA compensates for harms ancillary to the fraud itself that the government may have suffered as a result of the contractor's fraudulent claims. *See Ab–Tech Constr. v. United States,* 31 Fed.Cl. 429, 434–35 (1994), *aff'd,* 57 F.3d 1084, 1995 WL 358218 (Fed. Cir.1995). Each false claim results in one penalty. *See Bornstein,* 423 U.S. at 309 n. 4, 96 S.Ct. 523 (citations omitted). The statute defines a "claim" as "any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, . . . ." 31 U.S.C. § 3729(c).

In the liability phase, the court found that each signed DD250 form submitted by plaintiff for howitzers containing ASC TMBs was a claim for payment in the form of an invoice under the FCA. The court found that plaintiff had submitted fraudulent claims in the form of the DD250s and was therefore liable under the FCA.[4]

BMY delivered 191 howitzers containing ASC TMBs that had not been RT and MT inspected as required by the contract. BMY submitted two DD250s for each howitzer, a constructive delivery DD250, and a shipping DD250, both of which were used to invoice the government for costs associated with the howitzer. Defendant states in its motion for summary judgment that while it is of the opinion that both DD250s constitute false claims, it only seeks one penalty for each howitzer. Thus, defendant seeks 191 penal-

---

4. The court also found that plaintiff had submitted false records in support of its false claims, which is a separate violation of the FCA. 31 U.S.C. § 3729(a)(2). Such records, however, do not equate to separate penalties when the records and the claim support the same false de-

mand for money. *See Miller v. United States,* 213 Ct.Cl. 59, 550 F.2d 17, 23–24 (1977), *see also Woodbury,* 359 F.2d at 378 (one penalty awarded for each false claim for money that had attached to it separate false papers).

ties, each in the amount of $10,000. Plaintiff argues that both the number and amount of penalties defendant seeks are excessive.

### 1. Number of Penalties

Plaintiff argues that 191 penalties are excessive. Plaintiff states that prior to its learning of ASC's failure to inspect in April 1986, 18 constructive delivery DD250s had been submitted to the government. Therefore, plaintiff argues that the statutory penalties should amount to, at most, 173, the number of constructive delivery DD250s that were submitted subsequent to BMY gaining knowledge that the inspections were not being performed.

Defendant states that while plaintiff is correct that constructive delivery DD250s had been submitted for 18 vehicles prior to April 1986, plaintiff also submitted shipping DD250s for those 18 vehicles well after April 1986. Defendant states, and the court agrees, that when BMY submitted the shipping DD250s for those vehicles, it had an ongoing obligation to notify the United States that the howitzers failed to conform to the contract. Accordingly, while the number of penalties will not be affirmatively established until the quantum stage, such number will most likely consist of one penalty for each howitzer with a DD250, constructive delivery or shipping, submitted to the government after BMY gained knowledge that ASC was not performing the required RT and MT inspections.

### 2. Amount of Penalties

As stated above, defendant seeks the maximum $10,000 for each penalty, while plaintiff asserts that $5,000 would be more appropriate on the facts of the case. The amount that the court will assess for each penalty is within the discretion of the court. While both parties submitted several factors in favor of their positions, the court will not consider such factors until the quantum stage. The parties should note, however, that the court will tend to lean towards the more severe penalty the longer these proceedings are drawn out without BMY accepting responsibility for its fraud. From plaintiff's most recent submissions to the court, it is clear that even though the court has ruled on plaintiff's liability, plaintiff is still of the mindset that the contract contained excessive inspection requirements, and therefore the lack of inspections was reasonable even though it was in direct violation of the contract. In other words, plaintiff still has not admitted that the TMBs, and the resulting howitzers, were actually flawed.

■ As a result of the foregoing, defendant's motion for summary judgment as to the categories and quantum of FCA damages which it will recover is denied because material facts remain in dispute which must be addressed in the quantum phase.

## II. Common Law Breach Damages

Defendant seeks, as damages for plaintiff's breach of contract, its costs allegedly resulting from plaintiff's failure to ensure MT inspection of the ASC TMBs, interest on certain premature contract payments, and prejudgment interest on its breach of contract damages. For the reasons set forth below, defendant's summary judgment motion on its damages for plaintiff's breach of contract is denied as a result of disputed material facts. The court reminds the parties, however, that the following will be the framework utilized to determine quantum.

### A. Breach of Contract Damages For Failure to MT Inspect

The court held in the liability opinion that plaintiff's failure to ensure the inspection of all ASC TMBs as required by contract 5811 constituted a breach of contract that caused injury to defendant. Plaintiff had argued that defendant's breach of contract counterclaim was untenable because defendant's acceptance of the howitzers was final. This court held, however, that defendant's acceptance was revoked as a result of the presence of fraud.

As stated above, defendant's claimed FCA damages involve the failure of BMY to ensure RT inspection. Defendant seeks damages for BMY's failure to ensure MT inspection of the ASC TMBs under the breach of

contract theory in order to avoid litigating whether such damages are "consequential."[5]

The court previously found that MT inspections, unlike RT inspections, could not be performed in the field and that plaintiff proposed no alternative MT test. Therefore, the MOA did not address MT testing and defendant has had to remedy the problems associated with the failure of BMY to ensure MT inspections. When considering how to perform the MT tests, or the equivalent thereof, defendant alleges that it was faced with the choice of either shipping each TMB to a facility capable of performing MT tests or of formulating an alternate method that would have a less extensive impact on military readiness. Defendant alleges that it chose the latter option and assembled a panel of experts to investigate and determine whether the uninspected TMBs could be used without catastrophic failure and, if so, for how long. Accordingly, defendant seeks as damages for plaintiff's breach of contract its costs for this substitute testing program.

### 1. Breach of Contract Damages

 Damages for breach of contract should place the injured party in as good a position as if the breaching party had fully performed. *See Estate of Berg v. United States*, 231 Ct.Cl. 466, 687 F.2d 377, 379 (1982) (citations omitted). The injured party is entitled to recover those damages that are a foreseeable result of the breach. *See Mega Constr. Co. v. United States*, 29 Fed.Cl. 396, 501 (1993). Inspection or testing costs are recoverable damages if they result from, and are causally related to, the breach. *See Page v. United States*, 120 Ct.Cl. 27, 57, 1951 WL 5342 (1951) (allowing recovery of inspection and administrative costs as a result of the breaching party failing to complete its work within the contract period); *River Constr. Corp. v. United States*, 159 Ct.Cl. 254, 270, 1962 WL 9302 (1962) (stating that costs incurred, even if verified, do not equate to reasonable damages unless the costs are "tied in to fault" on the part of the breaching party). Therefore, in the instant case, defen-

dant must prove that the tests performed were causally related to and foreseeable in the event of plaintiff's breach.

 The government claims that the costs incurred during the alternative testing program were caused by BMY's failure to ensure MT inspection of the TMBs, and that such testing was justified under the circumstances. The government also argues that such damages were foreseeable to BMY. Plaintiff, on the other hand, alleges that the only conceivable damages that could have been caused by plaintiff's breach are the costs of the omitted contractual MT inspections, and that the government's costs were not foreseeable.

While defendant is entitled to damages for plaintiff's breach of contract, the court cannot determine the quantum of such damages until the quantum stage. Therefore, the court denies defendant's summary judgment motion as to its quantum of damages for plaintiff's breach of contract for its failure to ensure MT inspection of the TMBs.

### B. Interest on Premature Contract Payments

Defendant also seeks, for plaintiff's breach of contract, interest on the amounts prematurely paid to BMY in connection with its submission of 18 DD250s prior to BMY's learning in April 1986 that ASC had not inspected the TMBs. To the extent such interest is found to be unrecoverable under defendant's FCA single damages, *see supra* Sec. II.A.2., it is likely a reasonable category of defendant's damages for plaintiff's breach of contract.

### C. Prejudgment Interest on Common Law Damages

Defendant seeks an award of prejudgment interest on its common law damages. An award of prejudgment interest is discretionary. *Mega*, 29 Fed.Cl. at 503 (citations omitted). The court, however, will not rule on whether prejudgment interest is recoverable until the quantum stage when it will consider such factors as plaintiff's financial condition,

---

**5.** Plaintiff also seeks damages that the court does not allow under the FCA. For example, the government could seek its administrative costs

for processing RFWs if the court determines that they are not allowable as FCA single damages. *See supra* Sec. II.A.4.

the time it took to bring this litigation to an end, and plaintiff's apparent good faith. *See id.*

### CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment on the categories and quantum of damages for plaintiff's violation of the False Claims Act and plaintiff's breach of contract, is denied. The court is pleased, however, with the legal framework that has been established in this second phase in preparation for quantum. The government's seeking its damages for failure to ensure RT inspection under the FCA and for failure to ensure MT inspection under the breach theory appears to be a logical allocation of damages. Within 30 days, the parties shall inform the court whether they wish to pursue a negotiated settlement, or to schedule proceedings on quantum, the third and final stage of this litigation.

**IT IS SO ORDERED.**