UNITED STATES of America ex rel. Brett ROBY, Plaintiff,

v.

**THE BOEING COMPANY, Defendant.**

No. C–1–95–375.

United States District Court, S.D. Ohio, Western Division.

Nov. 2, 1999.

James Burdette Helmer, Jr., Frederick M. Morgan, Helmer Martins & Morgan, Cincinnati, David Phillip Wilson, James Edward Wimberley, Michael A. Havard, Provost & Umphrey, Beaumont, TX, Charles V. Firth, Reuben A. Guttman, Daniel J. Guttman, Provost & Umphrey, Michael F. Hertz, Alan E. Kleinburd, Dennis L. Phillips, Alicia J. Bentley, Sara Winslow, Michael S. Child, U.S. Department Of Justice, Civ. Div., Commercial Litigation Branch, Fraud Section, Washington, DC, for Brett Roby, USA, plaintiffs.

Jerome Charles Randolph, Keating, Muething & Klekamp, Cincinnati, Curtrice M. White, Todd W. Rosencrans, Steve Y. Koh, Steven S. Bell, Mark H. Lough, Gary DiBiance, Perkins Coie, Seattle, WA, Mitchell S. Ettinger, Bonnie J Austin, Martin T. Moe, Skadden, Arps, Slate, Meagher & Flom, Edward J. Meehan, Raina E. Burbaker, Jennifer L. Spaziano, Skadden Arps Slate Meagher & Flom, Gary DiBianco, Sskadden Arps Slate Meagher & Flom, Washington, DC, for Boeing Company, Speco Corporation, defendants.

## ORDER

SPIEGEL, Senior District Judge.

This matter is before the Court on the Government's Motion for Partial Summary Judgment as to Defendant's Third Affirmative Defense Re: The High Value Items Clause (hereinafter, "the Government's Motion for Partial Summary Judgment") (doc. 296); Defendant's Memorandum in Opposition to the Government's Motion for Partial Summary Judgment (hereinafter, "Defendant's Response") (doc. 340); Government's and Relator's Joint Reply in Support of its Motion for Partial Summary Judgment (hereinafter, "Plaintiffs' Joint Reply") (doc. 366); Aerospace Industries of America, Inc.'s Motion for Leave to Participate as *Amicus Curiae* (hereinafter, "Aerospace's *Amicus Curiae* Motion") (doc. 402); Government's Opposition to Aerospace's *Amicus Curiae* Motion (doc. 417); Relator's Opposition to Aerospace's *Amicus Curiae* Motion (doc. 422); Aerospace's Reply to the Government's and Relator's Opposition Memoranda (doc. 428); and Defendant's Reply to the Government's and Relator's Opposition Memoranda (doc. 429).

## BACKGROUND

On May 22, 1995, Relator Brett Roby (hereinafter, "Relator") filed this action under seal pursuant to Title 31 U.S.C. § 3730(b) on behalf of himself and the United States Government (hereinafter, "the Government") in the United States District Court for the Southern District of Ohio (doc. 2). Relator alleges that The Boeing Company (hereinafter, "Boeing" or "Defendant") and its supplier, The Speco Corporation (hereinafter, "Speco"),[1] violated the False Claims Act, Title 31 U.S.C. § 3729 *et seq.*, by manufacturing and selling defective transmission gears to the Government via Boeing's CH–47(D) Chinook Army helicopters (hereinafter, "CH–47–(D) helicopters") (*Id.*). On April 30, 1997, the Government intervened and filed an Amended Complaint (doc. 34) against Boeing. In the Amended Complaint, the Government alleges that Speco manufactured defective gears at its Springfield, Ohio facility before Boeing installed the gears in the CH–47(D) helicopters and provided them to the United States Army (*Id.*). The Amended Complaint was unsealed on May 1, 1997.

Government and Relator allege in Count I of the Amended Complaint that Defendant submitted false claims under Title 31 U.S.C. § 3729–3133, as amended by Pub.L. 99–562, 100 Stat. 3153 (1986) (doc. 34). Specifically, the Government contends that one of the Speco-made gears failed in 1991, leading to the total loss of a CH–47(D) helicopter and all of its contents, at an estimated loss of approximately $10 Million (*Id.*). In addition, the Government alleges that in 1993 a Speco-made gear failed in another helicopter resulting in a hard landing near Ft. Meade, Maryland, causing approximately $1 million in damage to the helicopter (*Id.*). The Government contends that "[b]y virtue of the acts described above, Boeing, by and through its officers, agents, and employees, knowingly submitted, and caused to be submitted, false or fraudulent claims for payment or approval to [its] officers, employees, or agents of the United States Government" (*Id.*). The Government concludes Count I with the contention that "[b]y reason of these payments made upon these false claims, the United States Government has been damaged as a result of Defendant's violations of the False Claims Act, arising under [Title] 31 U.S.C. §§ 3729(a)(1), (2), (3) & (7), for damages to be determined at trial ..." (*Id.*).

The Amended Complaint further asserts claims against Defendant for: (1) payment by mistake, (2) unjust enrichment, (3) breach of contract, and (4) common law fraud (Id.). The Government seeks to recover treble damages based on the value of the first CH–47(D) helicopter and its contents, for the cost of repairing the second

1. Although an original party to this action, Speco filed for bankruptcy and later settled this action with the United States and Relator in the United States Bankruptcy Court.

aircraft, and to treble those damages under the False Claims Act (*Id.*). In addition, the Government asserts that it is entitled to treble damages for the delivery of other U.S. Army Chinook helicopters that Speco allegedly manufactured with non-conforming engine transmission gears from 1987 to 1995, and statutory penalties of $5,0000 to $10,000 for the submission of each purportedly false claim for the helicopters in question (*Id.*).

In its Answer, Defendant submits a general denial of the Government's allegations of false claims, violations of the False Claims Act, and the resulting compensatory and statutory damages (doc. 161). Defendant defends by asserting a total of twelve (12) affirmative defenses that would individually or collectively relieve Defendant of all liability from the Government's claims (*Id.*).[2] Specifically, Defendant's Third Affirmative Defense states that the "damages sought by the [G]overnment are barred by its inclusion of the High Value Items Clause in the prime contract with Boeing" (*Id.*).

On December 12, 1998, the Government filed a Motion for Partial Summary Judgment (doc. 296) challenging Defendant's assertion of the High–Value Items Clause as an affirmative defense. Thereafter, Defendant filed a Response (doc. 340) and Government and Relator followed with a Joint Reply (doc. 366). This Court heard oral arguments on the Government's Motion on June 2, 1999 (doc. 441). On May 7, 1999, Aerospace Industries Association of America, Inc filed its Motion for Leave to Participate as *Amicus Curiae* (doc. 402). Shortly thereafter, the Government and Relator filed separate Motions in Opposition Memoranda (docs. 417 & 422); and followed by Aerospace's and Defendant's Reply briefs (docs. 429 & 429).

The Court believes it is important to note that, even though the Parties included discussions on the issues of the appropriateness and measure of consequential damages in their respective pleadings, this Order will only address the primary issue of the applicability of Defendant's Third Affirmative Defense in regards to the False Claims Act. Furthermore, any issues concerning the merits of the Government's and Relator's claims, or of Defendant's eleven (11) other affirmative defenses will not be addressed by the Court in this Order.

## STANDARD OF REVIEW

The narrow question that we must decide on a motion for summary judgment is whether there exists a "genuine issue as to any material fact and [whether] the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The Supreme Court elaborated upon the appropriate standard in deciding a motion for summary judgment as follows:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The moving party has the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-movant's case. Id. at 321, 106 S.Ct. 2548; *Guarino v. Brookfield Township Trustees*, 980 F.2d 399, 405 (6th Cir. 1992); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir.1989). If the moving party meets this burden, then the

---

**2.** Boeing alleges the following affirmative defenses to the allegations set forth in the Amended Complaint: (1) failure to state a claim upon which relief can be granted; (2) the fraud cause of action is time-barred; (3) the damages sought are barred by the High–Value Items Clause; (4) estoppel due to the

High–Value Items Clause; (5) consequential damages are not available; (6) no injury; (7) failure to plead fraud with particularity; (8) laches; (9) express contract; (10) special damages are not plead with specificity; (11) punitive damages are not plead with particularity; and (12) equitable estoppel (doc. 161).

non-moving party "must set forth specific facts showing there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see Guarino,* 980 F.2d at 405.

As the Supreme Court stated in *Celotex,* the non-moving party must "designate" specific facts showing there is a genuine issue for trial. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *Guarino,* 980 F.2d at 405. Although the burden might not require the non-moving party to "designate" facts by citing page numbers, " 'the designated portions must be presented with enough specificity that the district court can readily identify the facts upon which the non-moving party relies.' " *Guarino,* 980 F.2d at 405 (quoting *InterRoyal Corp. v. Sponseller,* 889 F.2d 108, 111 (6th Cir.1989), *cert. denied,* 494 U.S. 1091, 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990)).

Summary judgment is not appropriate if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Conclusory allegations, however, are not sufficient to defeat a motion for summary judgment. *McDonald v. Union Camp Corp.,* 898 F.2d 1155, 1162 (6th Cir.1990).

## DISCUSSION

### I. *Aerospace's Amicus Curiae Motion*

In relation to Aerospace's *Amicus Curiae* Motion (doc. 402), we note that Local Rule 7.2 sets forth the guidelines for the submission of memoranda filed with this Court. Aerospace asserts in its Motion that "a district court has discretion to grant *amicus curiae* status to a party for the purpose of providing such party the opportunity to present views on the issues before the Court, when such party has an important interest and a valuable perspective on the issues presented in this case" (*Id.*). *See, e.g., Michigan State AFL–CIO v. Miller,* 103 F.3d 1240, 1245 (6th Cir. 1997); *United States v. State of Michigan,* 940 F.2d 143, 146 (6th Cir.1991); *United States v. State of Michigan,* 680 F.Supp. 928, 943 (W.D.Mich.1987).

In the Government's and Relator's Opposition to Aerospace's *Amicus Curiae* Motion (docs. 417 & 422), they allege that Aerospace's Motion is untimely, improper, and not useful to this Court in deciding this matter. *See United States v. Michigan,* 940 F.2d at 165 ("[P]articipation as an *amicus* to brief and argue as a friend of the court was, and continues to be, a privilege within the sound discretion of the court"). Moreover, the Government and Relator assert that Aerospace and Defendant are attempting to file a *sur reply* disguised as an *amicus curiae* brief in violation of the Local Rule's "good cause" requirement. *See* S.D. Ohio Civ. R. 7.2(a)(2).

In contrast, Aerospace's Reply contends that its Motion for *Amicus* was "filed at an appropriate time during the proceedings, while the parties were in the midst of briefing cross motions for partial summary judgment, and was therefore timely" (doc. 428). *See Fluor Corp. v. United States,* 35 Fed. Cl. 284, 286 (1996) (finding that the filing of an *amicus* brief in the midst of cross motions for summary judgment was timely). Furthermore, Aerospace contends that its *"amicus* brief brings to the Court's attention considerations that are germane to the Court's decision[;] [Aerospace's] brief is helpful and necessary to the Court's resolution of the issues presented in this case" (*Id.*). *See Ryan v. Commodity Futures Trading Comm'n,* 125 F.3d 1062, 1063 (7th Cir.1997) (holding that an *amicus* brief should be allowed when the *amicus* has unique information or perspective that can help the court beyond that the lawyers or the parties are able to provide).

After reviewing this matter, this Court finds that Aerospace has an important interest and a valuable perspective that is helpful to the Court on the issues presented in this case. In addition, we find Aerospace's *Amicus Curiae* Motion to be in compliance with the guidelines set forth in Local Rule 7.2(a)(1) for the submission of memoranda filed with this Court, and,

thus, no further showing of "good cause" is required of Aerospace. *See* S.D. Ohio Civ. R. 7.2(a)(2).

Accordingly, pursuant to Local Rule 7.2, the Court finds Aerospace's Motion to be well-taken, and, thus, we hereby GRANT Aerospace's Motion for an Appearance as *Amicus Curiae* (doc. 402) in this action.

## II. *The Parties Arguments*

In the Government's Motion for Partial Summary Judgment (doc. 296), the Government seeks summary judgment as a matter of law as to the Third Affirmative Defense asserted by Defendant. The Third Affirmative Defense is brought on the grounds that the High–Value Items Clause [3] (hereinafter, the "HVIC"), set forth in Title 48 of the Code of Federal Regulations ("C.F.R."), § 46.800 *et seq.* (1999), and incorporated into the contracts between the Government and Boeing, allegedly provides no defense to the Government's claims against Defendant for violations of the False Claims Act (hereinafter, the "FCA") or common-law doctrines, such as fraud and unjust enrichment.[4] The Government asserts that it is not arguing that the HVIC is void and without effect. Rather, the Government argues, "its legal effect may be to limit Boeing's liability to lessen damages in a breach of contract action for any loss, destruction, or damage to the [G]overnment's property in situations where there is no proof of 'willful misconduct' or 'lack of good faith' by Boeing's 'managerial personnel' " (*Id.*). *See* 48 C.F.R. § 46.803(d)(2)(1999). Nonetheless, the Government reasserts that the HVIC

cannot be construed to preclude liability, limit damages, or be permitted to "engraft additional elements or requirements on to an Act of Congress, such as the FCA" (*Id.*).

In its Response, Defendant alleges that, pursuant to the HVIC, the Government agreed to hold Boeing harmless for the loss or damage to high-value government property, including any defects or deficiencies that may have been present in the CH–47(D) helicopters that Boeing delivered under the primary military contract (doc. 340). The HVIC, Defendant submits, bars the Government from seeking compensation for any loss or damage to the two helicopters under any of the claims asserted. Defendant sets forth several points as to why its Third Affirmative Defense should act as a bar to the Government's and Relator's FCA, fraud, and common law claims.

First, Defendant asserts that, as required by the Federal Acquisition Regulations (hereinafter, "F.A.R."),[5] the HVIC [6] is included in every military procurement contract for high-value items at the behest of, and for the benefit of, the Government. *See* 48 C.F.R. § 46.805(a)(2) (1999). Were it not for this Clause, Defendant contends that contractors (such as Boeing) would be forced to purchase extremely expensive liability insurance, the cost of which would be borne by the Government pursuant to established contract cost principles. *See* 48 C.F.R. § 31.205–19 (1999). Defendant writes "[t]herefore, in order to reduce significantly the cost of major defense sys-

---

**3.** *See* Title 48 C.F.R. § 52.246–24 (1999) "Limitation of Liability—High–Value Items."

**4.** Moreover, the Government contends in its Motion that while the HVIC may be applicable to its breach of contract claim against Defendant, it also believes there may be sufficient evidence of a " 'lack of good faith' by Boeing's managerial personnel" in order for Boeing to attempt to bring this case within an exception to the HVIC. *See* 48 C.F.R. § 46.803(d)(2) (1999). Nonetheless, the Government submits that whether there exists such evidence is irrelevant to this Motion. Additionally, the Government alleges that it

has reason to believe that Defendant has insurance coverage which renders the HVIC *per se* inapplicable. *See* 48 C.F.R. § 46.803(d)(3) (1999).

*Note:* The issue of whether or not Boeing is actually insured for this loss will not be addressed in this Order.

**5.** The Federal Acquisition Regulations are codified in Title 48 of the Code Of Federal Regulations ("C.F.R.") and are usually found under the same or similar section numbers.

**6.** *See* 48 C.F.R. § 52.246–24 (1999).

tems and equipment, the Armed Services have a long-standing practice—in existence since World War II and formally embodied in the FAR or its precursor since 1971—of self-insuring for damages to high-value items such as military aircraft" [7] (doc. 340).

Second, Defendant alleges that, on its face, the HVIC prohibits recovery for the claimed damages. Defendant further contends that the warranty clauses in the procurement contract limits its liability for defective components to the cost of "repair or replacement of the warranted primary or secondary component which originally failed" (doc. 340, Exs. 3 & 4). In particular, Defendant quotes the pertinent terms of the contract that allegedly bolsters its assertions that the HVIC bars the Government's claims. Defendant submits that the military procurement contract states, in pertinent part, that:

> [R]esultant damage from the failure [of a warranted part] does not include damage to Contractor-warranted components/parts which result from hard landing, crash impact, fire and/or explosion, although the cause of such occurrences may be traced in whole or in part to failure of a warranted component/part.

(doc. 240, Exs. 4 & 5).

Third, Defendant further submits in its Response that the HVIC was intended to preclude claims for damage to high-value

items, regardless of the Government's cause of action or theory of recovery. *See Australia v. Lockheed Aircraft Corp. & Menasco Mfg. Co.*, Civ. No. 69–1623–WPG (C.D.Cal. Jan. 10, 1972)[8] (hereinafter, *"Menasco"*) (doc. 340, Ex. 5); *see also* 4 United States Commission On Government Procurement, *Report of the Commission on Government Procurement* 87, 91–93 (1972) (hereinafter, *"Comm'n Report"*) (doc. 340, Ex. 6).[9] Thus, Defendant asserts that the reference to "contractual relief" in 48 C.F.R. § 46.803(c) is not simply relief from contractual claims (i.e., breach of contract), but is also relief from the damages arising out of the purchase or use of the goods delivered. *See In re Gulf & Midlands Barge Line, Inc.*, 509 F.2d 713, 719 (5th Cir.1975) (finding that the phrase "any peril" in the insurance policy of the National Aeronautics & Space Administration also included acts of negligence by the tug boat's crew).

Defendant also argues in its Response that precedent establishes that the "assumption-of-risk" clauses found in the procurement contracts may circumscribe the availability of damages under the FCA and other causes of action. Defendant submits that the case of *United States v. United States Cartridge Co.*, 198 F.2d 456 (8th Cir.1952), is directly on point with what the law and holding should be in this matter. In *United States Cartridge*, the court

---

**7.** " 'High-value item' means a contract end item that (a) has a high unit cost (normally exceeding $100,000 per unit), such as an aircraft, an aircraft engine, a communications system, a computer system, a missile, or a ship, and (b) is designated by the contracting officer as a high-value item." 48 C.F.R. § 46.802 (1999).

**8.** Based on the record before it, the district court in *Menasco* found that it was:

> [T]he practice of the United States Navy not to make damage claims against the manufacturers of military aircraft that it purchased for its own use, in the event of the loss of such aircraft. This practice was followed irrespective of any conclusion that the Navy might hold with respect to such matters as negligence or breach of warranty on the part of the manufacturer.

*Id.* at 2; *see also* doc. 340, Ex. 5.

**9.** The Commission on Government Procurement similarly reported that prior to *Menasco*, defense contractors "universally" understood that the general practice of the government in military contracting was to accept risk for loss or damage except for the warranted item that was defective. The Report went on to state that:

> The history of the government's pursuit of claims for lost or damaged property supports the industry understanding of the unwritten policy of self-insurance. Except for nominal repairs and replacements, there is little precedent in the courts, boards of contract appeals, or the General Accounting Office on claims against contractors … for recovery of such damages.

*Comm'n Report,* at 92; *see also* doc. 340, Ex. 6.

barred the government from bringing a FCA action because the government had agreed to limit the contractor's liability for damages, including those arising from fraud. *Id.* at 465. According to Defendant, the Eighth Circuit found that the Secretary of War had the statutory authority to enter into contracts in order to "allocate the risks and obligations which were to be assumed by the [contractor] and those which were to be borne by the government; [and] was authorized to limit the defendant's risks in that regard to whatever extent he deemed necessary in order to secure [the contractor's services]." *Id.* Defendant submits that, even if the Court finds that the High–Value Items Clause and the FCA are in conflict with each other, then the Government is nonetheless bound by its prior promises under the HVIC.

The Government and Relator (hereinafter, "Plaintiffs") submitted a Joint Reply (doc. 366) in support of the Plaintiffs' Motion for Partial Summary Judgment (doc. 296). Plaintiffs assert that the HVIC does not and cannot in any way limit the damages available under the FCA or modify the definition of "knowing" as set forth in the FCA (doc. 366). Plaintiffs also set forth several points in order to dispute the arguments presented by Defendant in its Response.

First, Plaintiffs contend that the HVIC is itself silent as to the FCA and common-law fraud claims, and the F.A.R. limits its application to "contractual remedies." *See* 48 C.F.R. §§ 46.803 & 52.246–24 (1999). Plaintiffs further assert that the complete silence in the HVIC, coupled with 48 C.F.R. § 46.803, demonstrates that the Department of Defense (hereinafter, the "DOD") intended that the HVIC be limited to contractual claims only. Plaintiffs distinguish the *Menasco* case from the instant matter by noting that, in *Menasco,* there was no evidence that the government of Australia ever advanced any claims relating to a FCA violation or common law fraud against either the prime contractor or the subcontractor that manufactured the failed landing gear. Instead, Plaintiffs insist that *Menasco* focused on products liability and negligence claims. *See Menasco,* Civ. No. 69–1623–WPG, at 2.

Second, Plaintiffs aver that liability and damages under the FCA does not arise from the defective nature of the products supplied but from a defendant's false statements and false claims concerning those products. *See United States ex rel. Compton v. Midwest Specialties, Inc.,* 142 F.3d 296, 301–02 (6th Cir.1998) (finding that liability under the FCA arose from false representations of a party that brake-shoe kits conformed to the terms of the contract). Moreover, Plaintiffs submit that when 48 C.F.R. §§ 46.803(a)—(d) are read together, it is clear that the Government does not act as a self-insurer as to contractual liability for the loss or damage to high-value items when the defects are the result of "willful misconduct" or a "lack of good faith" on the part of the contractor's management personnel (doc. 366). Those same public policy arguments should also apply to protect the Government from the fraudulent claims of contractors as well.

Third, Plaintiffs contend that to read the HVIC as Defendant suggests would improperly allow a regulation to supersede or modify a statute. *See, e.g., Robbins v. Bentsen,* 41 F.3d 1195, 1198 (7th Cir.1994) ("Regulations cannot trump the plain language of the statutes, and we will not read the two to conflict where such a reading is unnecessary.").[10] Plaintiffs argue that "[t]o adopt Defendant's argument would

---

**10.** *See also Burnside–Ott Aviation Training Center v. Dalton,* 107 F.3d 854, 858–59 (Fed. Cir.1997) ("Generally, a provision in a government contract that violates or conflicts with a federal statute is invalid or void.") (quoting *American Airlines, Inc. v. Austin,* 75 F.3d 1535, 1538 (Fed.Cir.1996)); *Urban Data Sys., Inc. v. United States,* 699 F.2d 1147, 1151 (Fed.Cir.1983) (holding that price adjustment clauses that violate a federal statute are invalid or void); *Yosemite Park v. United States,* 217 Ct.Cl. 360, 582 F.2d 552, 558 (1978) (finding that a provision in the contract that violated a federal procurement law was an unenforceable portion of that contract).

require the DOD to do by contract that which it cannot do under statute—resolve FCA and fraud claims" (doc. 366).

Moreover, Plaintiffs allege that Defendant's attempt to characterize *United States Cartridge* as a case that is on point with the issues at bar is inaccurate and "misleading" (doc. 366). Plaintiffs submit that *United States Cartridge* should be viewed as a case decided under a long-superseded version of the War Powers Act that had as its underlying theme the exigencies of the then-imminent World War II (*Id.*). *See United States Cartridge*, 198 F.2d at 463.[11] Plaintiffs conclude this point by stating that:

> Thus, despite Boeing's claims that *United States Cartridge* is directly on point with the instant case, it is clear that in the remanufactured contracts, which were not issued under the War Powers Act, not the product of a 'state of emergency,' and not subject to the unique manufacturing and labor issues of pre-World War II.[T]he contracting officer had no authority to waive or limit the United States claims against Boeing for its own fraud and violations of the FCA.

(doc. 366). Thus, Plaintiffs argue, there are no genuine issues of material fact that prevent this Court from finding in favor of the Government as a matter of law.

Nonetheless, in its *Amicus Curiae* Motion, Aerospace asserts that the High–Value Items Clause provides that the Government will self-insure for the loss caused by any damage to high-value items regardless of how the Government's damages are characterized (doc. 402). Moreover, Aerospace alleges that it, and its member companies, have conducted business with the Government in reliance on this common understanding of the HVIC (*Id.*). Aerospace contends that it has detrimentally relied on the HVIC, and, therefore, "[a]ny inconsistency between the policy language set forth in F.A.R. Part 46 and the High–Value Items Clause must be resolved in favor of the contract provision, which limits the Government's ability to recover for the loss of high-value items under the False Claims Act" (*Id.*). Furthermore, Aerospace argues that "[t]he Government's assertion that it can simply abrogate the contractual protections it has conferred upon its contractors by invoking a statute like the FCA and contending that the statute 'trumps' a valid and enforceable contract provision is equally unsupportable" (*Id.*).

After reviewing the Parties' briefs, exhibits, and evidence and after considering the oral arguments presented at the June 2, 1999 hearing, the Court concludes that there are no genuine issues of material fact that preclude a grant of summary judgment as to the Government's Motion for Partial Summary Judgment. Therefore, for the following reasons, this Court finds the Government's and Relator's arguments to be persuasive and well-taken. Accordingly, we hereby hold as a matter of law that Defendant Boeing's Third Affirmative Defense that was being asserted against the FCA claims brought by the Government and Relator is hereby DISMISSED for the reasons noted by the Court in Section V of this Order.

## III. The False Claims Act

### A. The "Qui Tam" Provisions of the FCA [12]

The FCA, which Congress originally enacted in 1863, is the "government's pri-

---

11. Plaintiffs further distinguish *United States Cartridge* by asserting that to compare the emergency situations during the World War II era with the limited monitoring accomplished by Government inspectors would also be "misleading." "The inclusion of an inspection clause in a contract does not modify the prime contractor's responsibility to supervise its subcontractors and does not make the Government the *de facto* manager of the facil-

ity," as was the case in *United States Cartridge* (doc. 366).

12. The following summary of the history of the FCA was compiled in its entirety by a review of the Congressional Record and from the relevant portions of the Seventh Circuit's decision in *United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 745–46 (9th Cir.1993) (holding that a former employee of a government contractor who brought an action against the

mary litigative tool for combating fraud" against the federal government. S.Rep. No. 99–345, at 2 (1986). The Act authorizes both the Attorney General and private persons to bring civil actions to enforce the Act. Title 31 U.S.C. § 3730. Congress amended the FCA in 1986 to increase the financial and other incentives for private individuals to bring suits under the Act in the hopes of enlisting the aid of the citizenry in combating the rising problem of "sophisticated and widespread fraud." S.Rep. No. 99–345, at 2, 23–24 (1986).

Section 3730(b) of the FCA as now constituted provides that a person may bring a civil action for a violation of the substantive provisions of the Act "for the person and for the United States Government." 31 U.S.C. § 3730(b)(1). The action must be brought in the name of the government. An action under this provision is termed a *"qui tam"* [13] suit, and the person who brings such an action is referred to as a "relator" or "informer." *Id.* If the government files an action to enforce the FCA, a would-be relator may not later bring an action based on the same underlying facts. *Id.* § 3730(e)(3). Nor may a private party litigate a *qui tam* suit based upon the public findings of a government investigation or on disclosures made in the news media, unless that party is an original and independent source of the information on which the complaint is based. *Id.* § 3730(e)(4)(A)-(B).

Upon bringing a *qui tam* action, a relator must serve on the government a copy of the complaint and written disclosures of substantially all material evidence and information the relator possesses. The complaint must be filed *in camera* and remain under seal for at least sixty (60) days so that the government may investigate the relator's allegations; though upon a showing of "good cause," the government may move the court for an extension of the sixty (60) day period. *Id.* § 3730(b)(2), (3). By the end of the period provided for the government to complete its investigation, the government must decide whether to intervene and proceed with the action, "in which case the action shall be conducted by the government;" [14] or whether to decline to take over the action, "in which case the person bringing the action shall have the right to conduct the action." *Id.* § 3730(b)(4)(B).

The original version of the FCA allowed anyone to bring a *qui tam* action and receive up to fifty percent (50%) of the amount recovered. S.Rep. No. 99–345, at 8–10 (1986). This broad provision led to abuse and in 1943, following the Supreme Court's decision in *United States ex rel. Marcus v. Hess,* 317 U.S. 537, 546–47, 63 S.Ct. 379, 87 L.Ed. 443 (1943),[15] Congress amended the statute. The 1943 version of the FCA precluded actions "based on evidence or information the Government had when the action was brought." *United States ex rel. Stinson v. Prudential Ins.,* 944 F.2d 1149, 1153 (3d Cir.1991). This led to claims being barred even in cases where the *qui tam* supplied the information to the government before filing the claim. *See United States ex rel. Wisconsin v. Dean,* 729 F.2d 1100, 1106–07 (7th Cir.1984).[16]

---

contractor under the *qui tam* provisions of the FCA met the Article III standing requirements, and did not violate the Due Process Clause of the U.S. Constitution).

**13.** The term *"qui tam"* is short for *"qui tam pro domino rege quam pro se imposo sequitur,"* which is interpreted as "he who brings the action as well for the king as for himself." *Bass Anglers Sportsman's Soc'y of America v. U.S. Plywood–Champion Papers, Inc.,* 324 F.Supp. 302, 305 (S.D.Tex.1971).

**14.** *Id.* § 3730(b)(4)(A).

**15.** In *United States ex rel. Marcus,* the Supreme Court held that a relator could bring a *qui tam* action even though the action was based entirely upon information contained in the government indictment. *Id.,* 317 U.S. at 546–47, 63 S.Ct. 379.

**16.** The holding in *United States ex rel. Wisconsin,* was subsequently superseded by statute in a number of states (including Illinois, California, Maryland, Oklahoma, Virginia, Wisconsin, and Vermont).

In 1986, Congress again amended the FCA in order "to encourage any individual knowing of governmental fraud to bring that information forward." S.Rep. No. 99–345, at 2 (1986). According to the Third Circuit, "[t]o revitalize the *qui tam* provisions, the amendment provided incentives for private enforcement, including increased monetary awards, adopted a lower burden of proof, and allowed a *qui tam* to remain a party in the action even if the government intervenes." *Stinson*, 944 F.2d at 1154.

## B. *Damages Under The FCA*

■ The FCA itself does not specify how to quantify damages, but states instead that the government should be awarded damages that it "sustains because of" the contractor's fraudulent acts. 31 U.S.C. § 3729(a). Damages under the FCA are intended to "provide for restitution to the government of money taken from it by fraud. . . ."[17] *United States ex rel. Marcus*, 317 U.S. at 551, 63 S.Ct. 379. Trebling the damages and imposing penalties "were chosen to make sure that the government would be made completely whole." *Id.* at 551–52, 63 S.Ct. 379.

■ Because each case under the FCA involves unique types of damages to the government, a formula for calculating damages must be created for each case that will provide the government with the damages directly caused by the filing of a false claim. *BMY—Combat Sys. Div. of Harsco Corp. v. United States*, No. 90–252 C, 1999 WL 456960, at *7, 44 Fed. Cl. 141 (July 7, 1999). As the Ninth Circuit stated, "[o]rdinarily the measure of the government's damages would be the amount that it paid out by reason of the false [claims] over and above what it would have paid if the claims had been truthful." *United States v. Woodbury*, 359 F.2d 370, 379 (9th Cir.1966).

Courts utilize several methods of calculation intended to ensure that the government receives "the benefit of its bargain," being careful not to award consequential damages. *See BMY—Combat Sys.*, 1999 WL 456960, at *7 (citing *United States v. Aerodex, Inc.*, 469 F.2d 1003, 1011 (5th Cir.1972)) ("[T]he language of the False Claims Act does not include consequential damages resulting from delivery of defective goods."). Although the *Aerodex* court firmly rejected consequential damages, the Sixth Circuit has awarded "repair" expenses to the government in a similar case. *See United States v. Ekelman & Assocs., Inc.*, 532 F.2d 545, 547–551 (6th Cir.1976) (finding that the government should be awarded not only its losses due to the defendant's loan default, but also its maintenance and repair costs after foreclosure).

## C. *FCA Case Law Applied*

As amended in 1986, the False Claims Act provides that the terms " 'knowing and knowingly' mean that a person, with respect to information: (1) has actual knowledge of the information, (2) acts in deliberate ignorance of the truth or falsity of the information, or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required." 31 U.S.C. § 3729(b).

The archetypal *qui tam* action is filed by an insider at a private company who discovers his employer has overcharged for services or supplies under a government contract. *See, e.g., United States ex rel. Green v. Northrop Corp.*, 59 F.3d 953, 968–69 (9th Cir.1995) (holding that a former employee of a federal contractor, who had signed a release of all claims against contractor in settlement of earlier litigation, brought *qui tam* action against contractor under FCA and was allowed to sue contractor). However, FCA actions have also been sustained under theories of supplying substandard products or services;[18] false

---

17. The government is entitled to recover forfeitures even without proof of any damages or proof that payment was made on the claims. *See* S.Rep. No. 345, at 8 (1986); *see also United States v. McLeod*, 721 F.2d 282, 285 (9th Cir.1983) (The "damages provision of the

False Claims Act is meant not only to compensate the government fully but also to deter fraudulent claims from being filed against it.").

18. *See Aerodex*, 469 F.2d at 1003.

negotiation, including bid rigging and defective pricing;[19] and false certification.[20] *See United States ex rel. Compton,* 142 F.3d at 303–04.

In *United States v. Bornstein,* 423 U.S. 303, 311, 96 S.Ct. 523, 46 L.Ed.2d 514 (1976), the Supreme Court interpreted the FCA to differentiate contracts from claims[21] submitted under contracts, holding that only the latter gave rise to liability under the FCA. The Court held that the defendant is liable under the statute because he engaged in conduct that caused the false claims to be submitted to the United States, and the Court explained that:

> While it is true that no false claims would have been submitted had [the defendant] and [its prime contractor] not entered into a contractual relationship, the entry into that relationship did not in itself cause the submission of any false claims ... The language of the statute focuses on false claims, not on contracts.

*Id.* at 311, 96 S.Ct. 523 (discussing *United States ex rel. Marcus,* 317 U.S. at 552, 63 S.Ct. 379). Similarly, in *United States v. Ueber,* 299 F.2d 310, 313 (6th Cir.1962), the Sixth Circuit held that a cause of action under the FCA did not arise "until the first voucher seeking payment of the false claims was presented to the United States." *See also Ekelman & Assocs.,* 532 F.2d at 551–52 (stating that "no cause of action arises ... until the [defendant]

presents a claim to the [government] for payment ..."). In another case, the Sixth Circuit explained that if the "government [is] seeking to state a claim under the FCA [it] must allege a false claim for payment made upon the government, not merely a fraudulent contract." *Kaminski v. Teledyne Industries, Inc.,* No. 96–3621, 1997 WL 415314, at *4 (6th Cir. July 21, 1997).

### D. Threshold Issue.

Neither the Government nor Relator cites to a single case in which the Government was able to recover under the FCA for damages that would otherwise be excluded by the HVIC. Similarly, the only case cited by Defendant that allegedly stands for the proposition that a contractor could successfully defend against a governmental-entity using a limited liability provision is *United States v. United States Cartridge Co.* However, *United States Cartridge* did not directly involve the HVIC (which was not promulgated until 1971), nor did it involve a modern version of the FCA. In fact, after a comprehensive case law search of all of the federal districts in the United States, this Court has been unable to locate any case on point with the facts and issues presented by the Parties in the instant matter. Indeed, even Defendant concedes that, as far as it is aware, "this litigation marks the first time that the [G]overnment has brought suit to recover damages under the FCA that would be [otherwise] disallowed by the High–Value Items Clause" (doc. 340). As stated above, the pleadings of Plaintiffs[22] and Defendant[23] offer several op-

---

**19.** *See United States v. Ehrlich,* 643 F.2d 634 (9th Cir.1981).

**20.** *See United States ex rel. Hopper v. Anton,* 91 F.3d 1261, 1266 (9th Cir.1996).

**21.** The term "claim" is defined in 31 U.S.C. § 3729(c) of the False Claims Act and provides, in pertinent part, that:

> For purposes of this section, 'claim' includes any request or demand, whether under a contract or otherwise, for money or property, which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the government will reimburse such contractor, grantee, or oth-

er recipient for any portion of the money or property which is requested or demanded.

**22.** Some examples of the Plaintiffs' theories as to why the HVIC is not a valid affirmative defense to its claims under the FCA are that: (1) the plain language of the HVIC applies only to contractual remedies; (2) a regulation such as the HVIC cannot abrogate or limit a statute enacted by Congress, such as the FCA; and (3) only the Attorney General of the United States can compromise a claim under the FCA (doc. 296).

**23.** Some examples of Defendant's theories as to why the HVIC acts as a complete defense to Plaintiffs' claims under the FCA are that: (1) the HVIC prohibits recovery for the

posing theories, rationales, and defenses as to whether the HVIC is, or is not, a valid defense to the Government's claims under the FCA.

Since the Court is satisfied that the Parties are correct in that this action is a case of first impression in the federal courts of the United States, the threshold issue in this matter is "Whether the High–Value Items Clause is applicable or acts as a valid affirmative defense to claims filed under the False Claims Act, Title 31 U.S.C. §§ 3729–3733."

## IV.  *The High–Value Items Clause* [24]

### A.  *"The Clause"*

Military procurement contracts with the DOD generally include certain limitations of contractual liability, which are provided for in the Federal Acquisition Regulations and are subsequently codified in the Code of Federal Regulations.  One of these provisions, known as the High–Value Items Clause, provides a "limit[ation] of contractor liability for loss or damages to the property of the Government that (a) occurs after acceptance,[25] and (b) results from defects or deficiencies in the supplies delivered or the services performed."  48 C.F.R. § 46.800 (1999).  The military procurement contracts for providing the CH–47(D) helicopters to the Army included the HVIC, which states, in pertinent part, that:

> (a) Except as provided in paragraphs (b) through (e) below, and notwithstanding any other provision of this contract, the Contractor shall not be liable for loss of or damage to property of the Government (including the supplies delivered under this contract) that (1) occurs after the Government's acceptance of the supplies delivered under this con-

tract, and (2) results from, any defects or deficiencies in the supplies.

> (b) The limitation of liability under paragraph (a) above shall not apply when a defect or deficiency in, or the Government's acceptance of, the supplies results from the willful misconduct or lack of good faith on the part of any of the Contractor's managerial personnel.  The term "Contractor's managerial personnel," as used in this clause, means the Contractor's director's, officers, and any of the Contractor's managers, superintendents, or equivalent representatives . . .

> (c) If the Contractor carries insurance, or has established a reserve for self-insurance, covering liability for loss or damage suffered by the Government through the purchase or use of the supplies required to be delivered under this contract, the Contractor shall be liable to the Government, to the extent of such insurance or reserve, for the loss of or damage to property of the Government occurring after the Government's acceptance of, and resulting from any defects or deficiencies in, the supplies delivered under this contract.

> (d)(1) This clause does not diminish the Contractor's obligations, to the extent that they arise otherwise under this contract, relating to correction, repair, replacement, or other relief for any defect or deficiency in supplies delivered under this contract . . . .

48 C.F.R. § 52.246–24(a)–(d) (1999).

### B.  *Historical Background*

The HVIC embodies a long-standing practice of the DOD to self-insure for damage to high-value items.  This practice was put in writing in 1971 following the loss of

---

claimed damages;  (2) the HVIC was intended to preclude these damages, regardless of the Government's cause of action or theory of recovery;  and (3) the Government's express "assumption of risk" through a contract clause is enforceable, and is fully compatible with the Attorney General's authority to conduct litigation (doc. 340).

**24.**  *See* 48 C.F.R. § 52.246–24 (1999).

**25.**  For purposes of this Motion, the Government has conceded that "acceptance" has occurred (*see* doc. 296).

a military aircraft, purportedly as a result of a defective landing gear, that had been purchased by the U.S. Navy and resold to the Australian Navy (doc. 340, Ex. 5). *See Menasco,* Civ. No. 69–1623–WPG, at 2. The Government of Australia sued the manufacturer and its subcontractor, seeking tort, contract, and products liability damages for the loss of the aircraft. *Id.* at 2; *see also Comm'n Report* at 91–93 (*see* doc. 340, Ex. 6). Based on the record before it, the district court in *Menasco* found that it was:

> [T]he practice of the United States Navy not to make damage claims against the manufacturers of military aircraft that it purchased for its own use, in the event of [the] loss of such aircraft. This practice was followed irrespective of any conclusion that the Navy might hold with respect to such matters as negligence or breach of warranty on the part of the manufacturer.

*Menasco,* Civ. No. 69–1623–WPG, at 2. The court further found that this practice had two principal purposes: (a) to encourage the manufacturer to refrain from obtaining products liability insurance and passing the costs of the premiums on to the Navy; and (b) to encourage the manufacturers to cooperate fully, without apprehension, in the investigation into the causes of any crashes, in order that such causes might be overcome and similar accidents thereby avoided in the future. *Id.* at 2–3.[26] The *Menasco* court also found that the U.S. Navy could have been estopped from pursuing any claim based on the loss of the aircraft because the airframe industry "was well aware of such practice and acted in reliance thereon."[27] *Id.* at 3.

The Commission on Government Procurement similarly reported that, prior to *Menasco,* defense contractors:

[U]nderstood that the general practice of the government in military contracting was to accept the risk for loss or damage except for the warranted items that were defective . . .

The history of the government's pursuit of claims for lost or damaged property supports the industry understanding of the unwritten policy of self-insurance. Except for nominal repairs and replacements, there is little precedent in the courts, boards of contract appeals, or the General Accounting Office on claims against contractors . . . for recovery of such damages.

*Comm'n Report* at 92.

The filing of the *Menasco* suit engendered numerous expressions of concern from defense contractors, prompting the DOD to formalize its unwritten practice. *Id.* In 1971, the DOD issued *Defense Procurement Circular 86,* which sets forth the Armed Services Procurement Regulations limiting contractor liability for defects. This was the prototype for the modern version of the High–Value Items Clause.

## V. *The Court's Analysis*

### A. *The High–Value Items Clause Is Inapplicable To False Claims Act Cases.*

■ This Court holds as a matter of law that the Third Affirmative Defense asserted by Defendant, which invokes the High–Value Items Clause, set forth in 48 C.F.R. §§ 46.800 *et seq.* & 52.246–24 (1999), and incorporated into the contracts between the Government and Boeing, provides no defense to the Government's and Relator's claims against Boeing for violations of the False Claims Act. As a point of clarification, we note that this Court is not holding that the High–Value Items Clause is void

---

26. *See also Can a Company be a Little Bit Liable?,* Business Week, Oct. 18, 1969, at 59 (discussing the fact that if the government did not assume the risk for losses resulting from crashes of aircraft built for its own use, a subcontractor could be at risk for damages far in excess of the value of its contract) (*see* doc. 340, Ex. 7).

27. Nonetheless, the court held that the protections afforded by the practice of the U.S. Navy did not preclude the ultimate purchaser of the aircraft, Australia, from seeking such damages from the contractor. *Menasco,* Civ. No. 69–1623–WPG, at 4–5.

and without effect when applied to the statutory or common-law claims.[28] In fact, we believe that the High–Value Items Clause may be used by a defendant as a defense to a breach of contract or negligence action in order to limit defendant's liability for any loss, destruction, or damage to governmental property in situations where there is no proof of "willful misconduct" or "lack of good faith" by a defendant's managerial personnel. *See* 48 C.F.R. 46.803(d)(2) (1999). However, the High–Value Items Clause cannot be construed to preclude or limit liability damages for violations of the False Claims Act. The very language of the enabling regulation, F.A.R. § 46.800 *et seq.* which authorizes the HVIC in DOD contracts, limits its application to contractual remedies. Yet, claims under the False Claims Act are not contractual remedies. Therefore, the High–Value Items Clause is applicable only to contractual remedies and not to claims premised under the False Claims Act. Several aspects of the HVIC and the FCA lead this Court to this conclusion.

First, the HVIC itself is silent as to whether the HVIC applies to FCA claims, and, conversely, the FCA is silent as to whether the HVIC provides a contractor-defendant an affirmative defense to violations under the statute.[29] Congress deliberately set the FCA damages provision apart from other types of damages, including tort and contract damages. This Court is not willing to interpret the FCA or the HVIC in the way that Defendant wants in this case. *See Pickens v. Kanawha River Towing,* 916 F.Supp. 702, 705 (S.D.Ohio) ("Courts should give effect to two statutes that overlap unless there is a 'positive repugnancy between the two laws.'") (quoting *Connecticut National v. Germain,* 503 U.S. 249, 253, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992)) Moreover, the power to amend the Act rests with the Congress and not this Court. The very fact that Congress was willing to amend the terms and provisions of the FCA in 1943 [30] and 1986,[31] while not including the application of the HVIC as a limitation or defense to the statute's penalty provisions is powerful evidence that Congress never planned for the HVIC's applicability to the FCA. This Court can only highlight that, as of the date of this Order, both the FCA and the HVIC are silent in regards to each other, and until Congress says otherwise, we cannot substitute our judgment for the will of Congress. *See Pickens,* 916 F.Supp. at 705 ("Generally federal law disfavors preemption of one federal law by another, unless there is an 'express manifestation of intent.'") (quoting *United States v. General Dynamics,* 19 F.3d 770, 774 (2d Cir.1994)).

Second, claims under the FCA do not arise pursuant to a contract.[32] *See United*

---

**28.** Nor is this Court rendering a judgment at this time as to the issue of the merits of liability against Defendant in regards to the FCA or to the other fraud, contract, and tort claims that have been alleged by the Government and Relator in this action.

**29.** Common defenses to FCA actions include: (1) negligence or innocent mistake; (2) criminal penalties and civil damages that may violate double jeopardy; (3) substantial compliance; and (4) governmental acquiescence. *See* Paul W. Morenberg, Comment, *Environmental Fraud by Government Contractors; A New Application of the False Claims Act,* 22 B.C. Envtl. Aff. L.Rev. 623, 645–46 (1995).

**30.** For example, the 1943 Amendments to the FCA effectively restrained the relator when Congress voted to bar *qui tam* suits that utilized information possessed by the government, even in cases where the relator discovered the alleged fraud. S.Rep. No. 99–345, at 11–12 (1986). In addition, Congress instituted a notice requirement that compelled the *qui tam* relators to advise the government of their claims and to disclose all significant evidence. *Id.* at 12. The amendments also allowed the United States to join the *qui tam* suits and to control the litigation strategy. *Id.*

**31.** The 1986 amendments effectively revitalized the relator by expanding the FCA definition of fraud, increased both statutory fines and damages, liberalized the requirements for standing, and enhanced relator awards. *See* Michael S. McGarry, *Winning the War on Procurement Fraud: Victory at What Price?,* 26 Colum. J.L. & Soc. Probs. 249, 257 (1993).

**32.** There are three central elements of a FCA action: (1) a claim that is presented to the

*States v. Woodbury*, 359 F.2d 370, 377 (9th Cir.1966) (finding that the legal basis of claims is an intentional violation of the FCA and is not a mere breach of contract); *see also Ueber*, 299 F.2d at 313 (finding that the FCA was violated not by merely entering into a contract, but by the submission of fraudulent vouchers for payment). Claims under the FCA arise when a person knowingly presents or causes to be presented a false or fraudulent claim, or knowingly makes, uses or causes to be made or uses a false record or statement to get a false or fraudulent claim paid. *See, e.g.*, Title 31 U.S.C. § 3729(a)-(c) (defining a "claim" as "any request or demand, whether under contract or otherwise, for money or property . . ."); *United States v. Neifert–White Co.*, 390 U.S. 228, 233, 88 S.Ct. 959, 19 L.Ed.2d 1061 (1968) ("This remedial statute reaches beyond 'claims' which might be legally enforced to [include] all fraudulent attempts to cause the government to pay out sums of money."); *McLeod*, 721 F.2d at 284–85 (concluding that a "knowing endorsement" of a mistakenly issued Treasury check is a false claim). As we concluded above, the appropriate reading of the HVIC is one that is consistent with the plain language of both the HVIC itself and the FCA. Since claims brought under the FCA are not contract-based claims or dependent upon the degree of negligence involved, the claims are unimpaired by contractual limitations on liability.[33]

Third, there is no evidence that the DOD intended that the HVIC have such an impact on FCA claims. In fact, all of the historical records concerning the *Menasco* case focused upon contractual and products liability/negligence claims. *See Menasco*, Civ. No. 69–1623–WPG, at 2 (noting that it was not the practice of the Navy to make damage claims against the

aircraft manufacturers for "negligence or breach of warranty"); *see also In re Gulf & Midlands Barge Line, Inc.*, 509 F.2d at 719–20 (finding that the contract provided that the towing company would not be liable for "any peril", including the negligence of the crew). Therefore, Defendant's argument that, as a result of the *Menasco* case, and its progeny, the HVIC was promulgated to limit contractor liability under the FCA, is without support.

Finally, Defendant cites to the case of *United States Cartridge* as being directly on point with the issues at bar. The Court recognizes that this is the only case cited by either Party that addresses the issue of the limitation of liability in regards to a defendant-contractor being sued by the government under a prior version of the FCA. *See United States Cartridge*, 198 F.2d at 457–58. In addition, Defendant is correct when it asserts that the Eighth Circuit ultimately held in favor of the contractor and against the government when the court found that the contract provision pertaining to the limitation of liability did limit the government's claims under the FCA. *Id.* at 465.

However, this Court finds that the case of *United States Cartridge* is distinguishable in many respects from the case at bar. First, the underlying theme throughout the case was the exigencies of the then-imminent World War II, and the case was decided under an earlier version of the War Powers Act. *Id.* at 463. Second, the government contracts required the munitions contractor to hire a whole new and untrained workforce and to build munition factories under the direct control and supervision of the government. *Id.* at 463–64. The Eighth Circuit expressly stated that the analysis of the case would not be applicable to:

---

government; (2) that is false or fraudulent; and (3) that claim is presented to the government by a "knowing" defendant. *See* Title 31 U.S.C. 3729(a).

*Note:* That the terms and provisions of the contract, or the "contract" itself, is not an element of a FCA violation.

**33.** The F.A.R. expressly states that "[i]n contracts requiring delivery of high-value items, the Government will relieve contractors of contractual liability [not necessarily liability based on fraud or fraudulent conduct] for loss or damage to those items." 48 C.F.R. § 46.803(b) (1999) (brackets added).

[T]he conventional relationship between the government and a commercial corporate contractor not subject to government supervision and control, for the supplying of goods and services, and if the provisions limiting liability were to be viewed merely as an attempt to relieve such a contractor from liability for its own fraud, [then] the government's argument [that public policy precluded enforcement of the limitation of liability clause] might perhaps be unanswerable . . .

*But this was not a conventional government contract made under normal conditions; it was an unusual arrangement made to meet a crisis.*

*Id.* at 464 (emphasis added). The Eighth Circuit also found that the contract in question was "replete with provisions for the [government] to retain control over the operation of the plant and its personnel, even though they are designated as defendant's employees." *United States Cartridge,* 198 F.2d at 463. These are but a few of the unique facts, circumstances, and issues in *United States Cartridge* which we find to be completely distinguishable or absent from the instant matter. To compare the emergency situation and unique facts and circumstances of *United States Cartridge,* in which the munition facilities and its employees were "in reality . . . an instrumentality of the government,"[34] is simply wrong; and misses the mark between extensive governmental control of a prime contractor,[35] and limited governmental monitoring. Thus, this Court does not find *United States Cartridge* to be persuasive or applicable in the case at bar.

Accordingly, The Government's Motion for Partial Summary Judgment as to Defendant's Third Affirmative Defense Re: The High–Value Items Clause (doc. 296) is found to be well-taken, and is hereby GRANTED and Defendant's Third Affirmative Defense is DISMISSED.

34. *Id.* at 464.

35. The Eighth Circuit noted that, "Congress, we believe, clearly intended to give the Secre-

## CONCLUSION

For the foregoing reasons, Aerospace's Motion for Leave to Participate as *Amicus Curiae* (doc. 402) is GRANTED, and the Government's Motion for Partial Summary Judgment (doc. 296) is also GRANTED. Accordingly, Defendant's Third Affirmative Defense re: The High–Value Items Clause is hereby DISMISSED

SO ORDERED.

tary of War virtually a freehand in providing the means of meeting the emergency which existed." *United States Cartridge,* 198 F.2d at 463.